**RANDA/MADISON JOINT VENTURE III, Appellant,**

v.

**Gregory Robert DAHLBERG, Acting Secretary of the Army, Appellee.**

No. 00–1129.

United States Court of Appeals, Federal Circuit.

Decided Feb. 7, 2001.

Brian P. Waagner, Wickwire Gavin, P.C., of Vienna, Virginia, argued for appellant. With him on the brief was Elizabeth D. Evans.

Timothy McIlmail, Trial Attorney, Commercial Litigation Branch, Civil Division, Department of Justice, of Washington, DC, argued for appellee. With him on the brief were David M. Cohen, Director; Todd M. Hughes, Assistant Director; and William L. Olsen, Trial Attorney.

Before LOURIE, LINN, and DYK, Circuit Judges.

LINN, Circuit Judge.

Randa/Madison Joint Venture III ("Randa") seeks review of a final decision of the Armed Services Board of Contract Appeals denying Randa's appeal from a deemed denial of its claim by the United States Army Corps of Engineers (the "Corps"). Randa's claim is that it encountered excessive groundwater in the performance of its contract with the government, constituting both a Type 1 and a Type 2 differing site condition, as defined by the contract. *In re Randa/Madison Joint Venture III*, No. 49452, 1999 WL 669546 (A.S.B.C.A. Aug. 27, 1999). Because the board's determination that Randa did not prove either a Type 1 or Type 2 differing site condition is supported by substantial evidence and does not otherwise contain any reversible error, we affirm the board's denial of Randa's appeal.

## BACKGROUND

The government, through the Corps, issued a solicitation on March 1, 1994 for work that included the construction of a sewage pumping station, also called a pump house. *Id.*, slip op. at 1. The government retained a separate firm, CME Engineering, Inc. ("CME"), to prepare the design documents, which were to be "sufficiently detailed to permit construction contractors to submit responsive bids without the necessity to visit the project during bidding." [1] *Id.* at 2. The Corps had agreed to perform the necessary geotechnical investigation, including drilling and testing

---

1. Despite this intention, a representative of Randa did visit the site several times before

to determine various characteristics of the subsurface, at CME's direction. *Id.*

The pump house foundation was to extend forty feet below the surface and it was necessary to determine the extent, if any, of subsurface water at the pump house location. Any subsurface water would have to be removed during construction to a depth of five feet below the foundation, or forty-five feet below the surface. This process is called dewatering. *Id.* at 3.

The Corps drilled at least twelve holes, called soil borings, and performed specific tests on the soil that was removed. One of these soil borings, referred to as DH–11, was close to the pump house excavation and is, therefore, of particular relevance. *Id.* at 8. The specific tests performed on the soil borings are designed to allow contractors bidding on the contract to estimate the coefficient of permeability, referred to simply as permeability. A higher value of permeability indicates a soil type that allows water to flow more freely, which means that the dewatering process will be more difficult.

The first test was a blow count test, which is performed while drilling the soil borings. In drilling the soil borings, the Corps used a widely accepted boring methodology in which a soil sampler is driven into the earth by striking the sampler with a known and constant force. The number of strikes (blows), referred to as the blow count, required to drive the sampler each additional foot was measured and recorded. Blow count tests provide a measure of the soil density, with denser soil generally being less permeable. *Id.* at 4.

In addition, the soil samples were removed from the sampler, placed in jars, labeled, and classified. *Id.* at 4. The soil samples were classified using the Unified

Soil Classification System, a widely accepted soil classification system having fifteen categories of different soil types, each with a two-letter symbol. *Id.* at 5. Published charts exist that correlate these different soil types with different permeability ranges. *See id.* Boring logs were created showing the blow count at various depths, along with the different soil types encountered. The boring logs also indicate the depth of the water table.

The Corps also performed additional tests, including a sieve test, which measures the percentage of the soil that passes each of a series of gradually finer sieves. *Id.* The results of the sieve test were plotted in a set of gradation curves. *Id.* Two variables that a sieve test can provide are the percentage of fine grained material and the grain size distribution of the soil samples. *Id.* These two variables, along with the soil density from the blow count test, typically provide a better estimate of the permeability than that provided by the looking only at the soil type. *Id.* at 6. It is well known in the industry that this estimate of permeability can be made by using a Moretrench chart. *Id.* Three different Moretrench charts are available, one each for loose, medium, and dense soils. *Id.* Because there is no separate Moretrench chart for very dense soils, the dense soil chart is also used for very dense soils. *Id.*

The actual contract documents included the boring logs, but not the gradation curves or other test results. *Id.* at 7. The gradation curves and other test results, as well as the soil samples themselves, were made available for inspection at a Corps office.

Randa and the Corps entered into a contract to perform the required dewatering work. Two clauses of the contract addressed the materials that were made

submitting Randa's bid and observed a dry creek bed near the pump house excavation

site. *Randa,* slip op. at 12.

available for inspection. The first is a standard clause, entitled "Site Investigation and Conditions Affecting the Work," which is routinely included in government contracts and is standardized in the Code of Federal Regulations. The Site Investigation clause provided, in part, that:

> The Contractor also acknowledges that it has satisfied itself as to the character, quality, and quantity of surface and subsurface materials or obstacles to be encountered insofar as this information is reasonably ascertainable from an inspection of the site, *including all exploratory work done by the Government,* as well as from the drawings and specifications made a part of this contract. Any failure of the Contractor to take the actions described and acknowledged in this paragraph will not relieve the Contractor from responsibility for estimating properly the difficulty and cost of successfully performing the work, or for proceeding to successfully perform the work without additional expense to the Government.

*Randa,* slip op. at 2 (emphasis added); *see also* 48 C.F.R. § 52.236–3(a) (2000) (FAR 52.236–2(a)). This clause, at least facially, placed on Randa any risk associated with not inspecting the "exploratory work," which Randa conceded at oral argument included the gradation curves.

The second clause is a standard clause entitled "Physical Data," which is also routinely included in government contracts. Only a portion of the language in the "Physical Data" clause is standardized in the Code of Federal Regulations, with the remainder being left to the parties to determine. Section 2.2 of the "Physical Data" clause, entitled "Explorations" in the present contract, is part of that remainder left to the parties to decide. The "Physical Data" clause provided, in part, that:

2. PHYSICAL DATA

\* \* \* \* \* \*

2.2 Explorations: ... *Whenever subsurface exploration logs are presented in the contract documents, soil test results are available for inspection* in the Baltimore District, Corps of Engineers, Geotechnical Engineering Branch, Room 204, Fallon Federal Building, 31 Hopkins Plaza, Baltimore, Maryland. *Soils and rock samples are also available for inspection* ....

*Randa,* slip op. at 7 (emphasis added). Randa also conceded at oral argument that this clause informed Randa that soil test results, including gradation curves, and soil samples were available for inspection.

Prior to submitting its bid, Randa did not inspect the gradation curves, the other test results, or the soil samples that were available at the Corps office in Baltimore. *Id.* at 12. Whether as a result of this or not, Randa underestimated the extent of the dewatering operation, encountered enormous difficulty in dewatering the pump house site, and incurred additional expenses over the amount that it had projected and bid. In preparing its bid, Randa obtained quotes from three subcontractors for the dewatering work, but there is no indication that any of these subcontractors reviewed the material that was available for inspection. *Id.* at 10–11. Later in working through the dewatering problem, Randa hired a consultant, Hillis Carnes Engineering Associates ("H–C"), but H–C also did not review the material and information available for inspection until after it was retained and had submitted at least one proposed remedy. *Id.* at 13.

After realizing that its initial approach to dewatering the site was not working, Randa's subcontractor drilled another soil boring, referred to as DW–3. *Id.* at 14. H–C subsequently performed a sieve analysis on the DW–3 soil samples and developed a gradation curve. *Id.* at 14–15. Randa asserts that the DW–3 data accurately depicts the conditions actually en-

countered at the site and that these conditions qualify as a differing site condition under the contract.

After finishing the dewatering operation, Randa filed a claim with the government for an increase in the contract price, alleging that it encountered a differing site condition. The contract defined such conditions with a standard clause, entitled "Differing Site Conditions," which is routinely included in government contracts and is standardized in the Code of Federal Regulations. *Randa*, slip op. at 2. The Differing Site Conditions clause provided, in part, that:

> (a) The Contractor shall promptly, and before the conditions are disturbed, give a written notice to the Contracting Officer of (1) subsurface or latent physical conditions at the site which differ materially from those indicated in this contract, or (2) unknown physical conditions at the site, of an unusual nature, which differ materially from those ordinarily encountered and generally recognized as inhering in work of the character provided for in the contract.

48 C.F.R. § 52.236–2(a) (2000) (FAR 52.236–2(a)). This clause sets forth two types of differing site conditions. Type 1 differing site conditions are those encompassed by part (a)(1) above and Type 2 differing site conditions are those encompassed by part (a)(2) above.

The Corps failed to issue a final decision on Randa's claim, resulting in a deemed denial of the claim. Randa appealed to the Armed Services Board of Contract Appeals which held that Randa had failed to prove either a Type 1 or a Type 2 differing site condition. Accordingly, the board denied Randa's appeal. *Randa*, slip op. at 21. Randa appeals the board's denial to this court and we have exclusive appellate jurisdiction. 28 U.S.C. § 1295(a)(10) (1994); *see also* 41 U.S.C. § 607(g) (1994).

## DISCUSSION

### A. Standard of Review

■ The parties both recognize that the Contract Disputes Act sets forth our standard of review of the board decision. 41 U.S.C. § 609(b) (1994). Any decision on a question of law is reviewed de novo. *Id.; Perry v. Martin Marietta Corp.*, 47 F.3d 1134, 1137 (Fed.Cir.1995) (articulating standard of review). Any decision on a question of fact shall not be set aside unless it is: fraudulent, arbitrary, capricious, so grossly erroneous as to necessarily imply bad faith, or not supported by substantial evidence. 41 U.S.C. § 609(b) (1994); *Perry*, 47 F.3d at 1137.

### B. Analysis

#### 1. Controlling Precedent

■ As a preliminary matter, we respond to Randa's statement in its initial brief to this court that "[t]his case is governed by the decision in *North Slope Technical Ltd. v. United States*, 14 Cl.Ct. 242 (1988)." This statement, and the remainder of Randa's briefs, reflects a general misconception regarding the body of law that constitutes controlling precedent for this court. That body of law consists of: (1) decisions of the United States Supreme Court; (2) previous decisions by this court; and (3) "the holdings of the Court of Claims and the Court of Customs and Patent Appeals announced before the close of business on September 30, 1982." *South Corp. v. United States*, 690 F.2d 1368, 1370, 215 USPQ 657, 658 (Fed.Cir. 1982) (en banc). It does not include decisions such as *North Slope*, decided by the Claims Court after September 30, 1982.

#### 2. Type 1 Differing Site Condition

As mentioned earlier, FAR 52.236–2 was incorporated into the contract and defines Type 1 differing site conditions as "subsurface or latent physical conditions at the site which differ materially from those indicated in this contract." 48 C.F.R. § 52.236–2 (2000). The board found that no Type 1 differing site condition existed.

*Randa,* slip op. at 20. The board justified its conclusion with two independent reasons. The first was that the boring logs for DW–3 and DH–11 did not reflect conditions that were materially different. *Id.* at 19. The second was that Randa "had the duty to review the gradation curves and other soil test results and samples" and such a review would have revealed the conditions that were encountered. *Id.* at 19–20.

Randa argues that the board erred and that a Type 1 differing site condition existed. Randa advances two main arguments. The first argument is that the boring logs alone did not reveal the extent of the dewatering problem and that Randa had no duty to review the gradation curves and other additional information referred to in the contract. As indicated earlier, Randa conceded at oral argument that the Site Investigation clause and the Explorations clause each are broad enough to include the gradation curves. However, Randa claims that it had no duty to review the gradation curves and additional information "in the absence of a specific warning that the boring logs are unreliable or a statement that a review of the soil test results was required for bid preparation." The second argument is that the Corps' duty to disclose extended beyond making the gradation curves and additional information available for inspection. Randa asserts that the Corps had a duty to disclose, within the contract documents themselves, all information in its possession that was relevant and important, and that the Corps did not fulfill this duty.

Randa's overriding theme is that this case involves impermissible burden shifting. In its first brief to this court, Randa asserts that the Differing Site Conditions clause "is intended to shift the risks associated with unanticipated adverse subsurface conditions from contractors to the Government." Randa argues that the board's decision contravenes this risk-shifting function, placing the burden for such conditions back on the contractor. If this risk is to be shifted by virtue of the Site Investigations Clause and the Explorations clause, then, Randa argues, there must be a warning in the contract documents that the boring logs alone are not reliable.

The government responds that substantial evidence supports the board's conclusion that each of the DH–11 boring log and the DH–11 gradation curves were individually adequate to predict the water encountered. The government rejects Randa's assertion that the risk for differing site conditions has been impermissibly placed upon Randa. The government argues that any contractor, including Randa, has a duty to review information referred to by a contract, even if not contained within the contract, and that the Corps did not have a heightened duty of disclosure.

We uphold the board's finding that there is no Type 1 differing site condition. Our decision is explained below as we address, in turn: (1) Randa's duty to review the gradation curves; (2) the lack of any duty on the Corps to further disclose the gradation curves; (3) the conditions indicated by the contract, including the gradation curves; and (4) the materiality of any changes between the indicated conditions and the actual conditions.

a.

 Our first inquiry is to determine, as a matter of law, whether the board properly concluded that Randa had a duty to review the gradation curves and other additional information referred to in the contract. We conclude that it did.

 As stated earlier, the contract explicitly notified Randa that soil test results, as well as soil and rock samples, were available for inspection. Binding precedent from the Court of Claims reveals that such a reference puts the con-

tractor on notice of that information, and the contractor can be presumed to have reviewed it. *Flippin Materials Co. v. United States,* 160 Ct.Cl. 357, 312 F.2d 408, 412 (1963); *Hunt & Willett, Inc. v. United States,* 168 Ct.Cl. 256, 351 F.2d 980, 985 (1964).

In *Flippin,* the contractor was informed in writing at a pre-bid conference, as well as in the contract specifications, that the results of any explorations and tests were available for inspection. *Flippin,* 312 F.2d at 412. This notice apparently did not explicitly recite that any explorations or tests had actually been performed. However, the government had prepared "field logs" and it was undisputed that it was customary to do so. *Id.* at 411. Flippin was apparently not aware of the field logs and did not review them prior to submitting its bid. *Id.* It was also undisputed, however, that if Flippin had reviewed the field logs there could be no claim of a materially different site condition. *Id.* The *Flippin* court concluded that the language in the pre-bid conference writing and the contract specifications "covered the field logs, and therefore that [Flippin] is charged with notice of the information appearing in those documents." *Id.* at 412. The present case is even more compelling because the contract informed Randa that soil test results were available, and not merely that any tests that were performed would be available for inspection.[2]

In *Hunt & Willett,* the plaintiff urged that it was entitled to damages because the government failed to disclose information in its possession about the severity of raveling, that is, small surface rocks falling down a slope by force of gravity. *Hunt & Willett,* 351 F.2d at 983–84. The Court of Claims noted that the contract drawings

mentioned the availability of boring logs and the omission on the drawings of existing fault and joint systems. *Id.* at 985. The Court of Claims stated that "under this contract, there was no obligation on the Government to volunteer facts which could reasonably have been discovered through plaintiff's own investigation and pursuit of leads given by the contract papers." *Id.* at 985. The Court of Claims went on to note that "[w]here the contract incorporates [a site investigation clause], the contractor has no claim if the missing information would have been obtained through the inquiries contemplated." *Id.* (citing *Flippin,* 312 F.2d at 413–15). As explained earlier, the present contract also included a Site Investigation clause and a specific reference to additional soil tests, including gradation curves, that were available for inspection. *Hunt & Willett,* therefore, supports our conclusion that Randa had a duty to inspect the information explicitly made available by the Corps.

Randa cites *Jefferson Construction Co. v. United States,* 176 Ct.Cl. 1363, 364 F.2d 420, 423 (1966) for the proposition that a contractor need only inquire when a discrepancy, omission, or conflict is obvious or when the contractor is required by the terms of the contract to notify the government of such detected problems. However, *Jefferson* is inapposite. The duty to inquire referred to in *Jefferson* concerned resolving an obvious discrepancy in the contract documents. *Id.* at 422–24. It did not address the threshold question, decided in *Flippin,* of whether a contractor had to review information that the contract explicitly made available for inspection. *See id.*

Randa cites *Foster Construction, C.A. v. United States,* 193 Ct.Cl. 587, 435 F.2d

---

**2.** As Randa points out in its reply brief to the court, the *Flippin* court noted that "the contract contained no clause relating to changed sub-surface conditions." *Flippin,* 312 F.2d at 412. However, the *Flippin* court did not

comment as to how such a clause would have affected its conclusion and we do not find that this distinction compels a different result than the one we reach. *See id.*

873, 887 (1970), for the proposition that the Differing Site Conditions clause is intended to allow bidding contractors to rely on the contract alone without having to inspect additional information referred to and made available by the contract. It is clear that *Foster* gives voice to the policy objective of lowering government costs by providing bidding contractors with reliable subsurface data so that they do not have to inflate their bids to cover the cost of obtaining their own subsurface data or to cover the risks of not doing so. *Id.* ("Bidders are thereby given information on which they may rely in making their bids...."). However, *Foster* does not change the result that, under *Flippin*, Randa bears the risk associated with not examining the information that the contract explicitly referred to and made available for inspection. That is, *Foster* does not require that the information be disclosed in the contract documents themselves. To the contrary, *Foster* supports our conclusion that Randa had a duty to inspect the subsurface data provided by the Corps, whether in the contract documents or not, so that Randa's bid would not be inflated.

Randa also cites *United Contractors v. United States,* 177 Ct.Cl. 151, 368 F.2d 585, 597 (1966), parenthetically quoting its statement that "the contractor had every right to take at face value the information communicated by the profile drawings." That quote is taken out of context. The *United Contractors* court stated that "*[w]ithout more,* the contractor had every right to take at face value the information communicated by the profile drawings." *Id.* (emphasis added). The court then went on to consider "whether anything else in the contract documents" precluded the contractor from relying on the profile drawings. *Id.* After examining the contract documents, the *United Contractors* court ultimately determined that the contractor was not precluded from relying on

the profile drawings. In the present case, however, an examination of the contract documents would have led Randa to the gradation curves and other information made available for inspection. Thus, the examination of the contract documents required by *United Contractors* supports our conclusion that Randa had a duty to review the soil test results and other information explicitly mentioned and made available for inspection by the contract documents.

Finally, Randa cites *Hunt & Willett* and *Leal v. United States,* 149 Ct.Cl. 451, 276 F.2d 378 (1960), for the proposition that a contractor has a duty to inquire "in light of specific warnings included in [the] contract documents." However, Randa does not assert, and these cases do not hold, that a duty to inquire *only* arises with a specific warning. As discussed above, *Hunt & Willett* states that "[w]here the contract incorporates [a site investigation clause], the contractor has no claim if the missing information would have been obtained through the inquiries contemplated." *Hunt & Willett,* 351 F.2d at 985 (citing *Flippin,* 312 F.2d at 413–15). And in *Leal,* the Court of Claims looked outside of the actual contract in determining that the contractor knew or should have known about the presence of a water table, despite the government's withholding of some relevant information. *Leal,* 276 F.2d at 383–84. Therefore, both *Hunt & Willett* and *Leal* support our conclusion that Randa had a duty to examine the gradation curves and other information referred to and made available for inspection by the contract documents.

b.

██ Our second inquiry is to determine, as a matter of law, whether the Corps was under a heightened duty to disclose the information contained in the gradation curves for DH–11. We conclude that it was not.

Randa argues that the Corps had a duty to disclose within the contract documents, and not merely by reference, all information in its possession that was relevant and important, and that the Corps did not fulfill this duty. Given our conclusion above that Randa had a duty to inquire and review the gradation curves, it follows that the Corps had no further duty of disclosure in this case. That is, by referring to the gradation curves and additional information and making it available for inspection, the Corps did disclose that information. For this reason, we are also not persuaded by Randa's argument that the Corps had a duty to disclose the DH–11 gradation curves in the contract itself simply because the curves for that particular drill hole occupied only two sheets of paper.

As we discuss in the next section, the present case does not involve a situation in which the gradation curves contradicted the boring log. Accordingly, we express no opinion on whether such a contradiction would give rise to a heightened duty to disclose.

c.

Our third inquiry is to determine, as a matter of law, what the contract, including the gradation curves and additional information, "indicated" regarding the scope of the dewatering problem. The inquiry in this section is directed to the DH–11 findings, both from the boring log and the gradation curves, because the DH–11 soil boring was in the approximate location of and, thus, directly relevant to conditions relating to the pump house.

The board determined from the DH–11 boring log that the water table was ten feet below the surface. *Randa,* slip op. at 8. The board also determined from the DH–11 boring log that the high blow counts, indicating a less permeable soil, were inflated by the presence of gravel in the subsurface, and that the artificially low estimates of permeability that may be caused by gravel could be clarified by engineering judgment. *Id.* at 19. The board also found, presumably from the DH–11 boring log, that the excavation site was an unconfined aquifer because it was not confined by an upper strata of impermeable layer and the water was not under any pressure. *Id.* at 4, 8. Unconfined aquifers are known to be harder to dewater than confined aquifers. *Id.* The board thus found that the DH–11 boring log should have given the contractor a reasonable expectation of encountering a substantial amount of water and indicated, at least qualitatively, a large dewatering project. *See id.* at 18–19.

Quantitatively, the board determined that the DH–11 boring logs indicated that the pump house site contained soil of SP type at several depths, which is known to have a soil permeability between 15 and 560 feet/day. *Id.* at 15, 18. Using the DH–11 gradation curves, however, the board narrowed the estimated range of permeability. The board determined that the DH–11 gradation curves, and therefore the contract, indicated that the soil would have a permeability between seventeen and ninety-nine feet/day, which is in the range for SP soil. *Id.* at 16.[3]

Randa challenges these determinations, although its challenges focus almost exclusively on the DH–11 boring log. Randa asserts that the DH–11 boring log showed high blow counts and a large quantity of very fine materials, both indicating a low permeability. Randa also argues that the DH–11 boring log also showed a clay layer at approximately 58 feet below the surface that was expected to act as a floor, "sort of the bottom of the bathtub."

The government reiterates the board's finding that the DH–11 boring log shows a

**3.** This range was determined from the application of the gradation curves to a More-
trench chart for dense soils. *Randa,* slip op. at 16.

substantial presence of relatively permeable SP type soil. The government also argues that the DH–11 boring log shows traces of gravel at seventeen and thirty-seven feet, and a layer of gravel at forty-seven feet below the surface, and implies that this will increase the permeability. Finally, the government reiterates the board's finding that the DH–11 boring log shows that the pump house site was an unconfined aquifer, known to take longer to dewater than a confined aquifer.

◼ This court has previously explained that "in order to establish entitlement to an equitable adjustment by reason of a Type 1 differing site condition[,] ... the contractor must prove, by a preponderance of the evidence, that the conditions indicated in the contract differ materially from those it encounters during performance." *H.B. Mac, Inc. v. United States*, 153 F.3d 1338, 1345 (Fed.Cir.1998) (quoting in part *Stuyvesant Dredging Co. v. United States*, 834 F.2d 1576, 1581 (Fed.Cir.1987)) (quotations omitted). Determining what the contract indicated is a task of contract interpretation that this court performs de novo. *Id.* (citing *P.J. Maffei Bldg. Wrecking Corp. v. United States*, 732 F.2d 913, 916 (Fed.Cir.1984)). "[A] proper technique of contract interpretation is for the court to place itself into the shoes of a reasonable and prudent contractor and decide how such a contractor would act in interpreting the contract documents." *Id.* (citing *P.J. Maffei*, 732 F.2d at 917).

◼ Applying this de novo review, we agree with the board's determination that the contract indicated a soil permeability between seventeen and ninety-nine feet/day. Indeed, the record contains the Moretrench chart that, using the DH–11 gradation curves, predicted this range. We find further support for our conclusion in the testimony from a Corps witness that the Corps' gradation curves show that the soil will behave like SP type soil, which has a permeability between 15 and 560 feet/day. We also agree with the board that the DH–11 boring log shows a substantial presence of soil type SP. *See Randa*, slip op. at 8, 18.

Randa's arguments regarding high blow counts, the presence of very fine materials, and a clay layer are not persuasive. First, although the DH–11 boring log has generally high blow counts, indicating a very dense soil and suggesting a lower permeability, these counts are misleading, as the board found, because of the presence of gravel. *Id.* at 6, 8. A reasonable and prudent contractor would have known that such gravel increases blow counts, indicating a denser material, and thus a less permeable material, than actually exists. *Id.* at 6, 19. Second, although the presence of very fine materials would lower the permeability of a given soil, we note that the Moretrench chart takes the percentage of very fine materials into account. *Id.* at 6. Third, we find no evidence indicating that the clay layer at fifty-eight feet would lower the expected permeability of the soil at forty-five feet and above. The record suggests, to the contrary, that the pump house site was still an unconfined aquifer and still had to be dewatered down to forty-five feet below the surface. *Id.* at 3–4. Thus, the "bottom of the bathtub" would never be reached.

We recognize that a Moretrench chart for dense soils was used, instead of a Moretrench chart for very dense soils. However, the board's opinion, stating that "the chart for dense soils is ... also used for very dense soils," suggests that this is common practice. *Id.* at 6. Further, as noted above, the determination that the soil was very dense was based on the blow counts that were artificially high due to the presence of gravel. We find no evidence indicating what the gravel-adjusted blow counts would have been and whether the soil would still have been classified as very dense. We further find no evidence

that the use of the dense soil Moretrench chart introduced any appreciable error into the analysis. Given the lack of evidence indicating whether any appreciable error existed in the analysis, we are not dissuaded from the substantial evidence that the contract indicated a permeability range between seventeen and ninety-nine feet/day.

### d.

█ Our fourth inquiry relates to the board's findings regarding both the actual site conditions and the materiality of any differences between the actual conditions and those indicated by the contract. We must assess whether these findings are fraudulent, arbitrary, capricious, grossly erroneous, or unsupported by substantial evidence. We hold that they are not.

Randa argued to the board that soil boring DW–3 reflected the actual conditions encountered, and Randa continues to make that claim in its initial brief to this court. *Id.* at 18. Thus the board properly focused its analysis of the actual conditions on the DW–3 data. The board found that the DW–3 gradation curves, when applied to a Moretrench chart, predicted a permeability between twenty-three and eighty-five feet/day. *Id.* at 16. The record includes the actual chart showing that the predicted permeability range is between twenty-three and eighty-five feet/day. Thus, this finding is supported by substantial evidence and is not fraudulent, arbitrary, capricious, or grossly erroneous.

The board further found that it was "unable to conclude that boring log DW–3 reflected conditions materially different from [those] indicated by boring log DH–11." *Id.* at 19. Thus, the board found that there was no material difference between the conditions indicated in the contract and those actually encountered. The record includes the Moretrench chart showing that the permeability range predicted by

the DW–3 data, twenty-three to eighty-five feet/day, falls within the range predicted by the DH–11 data, seventeen to ninety-nine feet/day. Thus, this finding is also supported by substantial evidence and is not fraudulent, arbitrary, capricious, or grossly erroneous.

Randa again points to the possible error introduced by the use of the Moretrench chart for dense soils. However, Randa has not pointed to any evidence showing that the range predicted by the DH–11 data, even if properly adjusted according to Randa's argument, would not still overlap that predicted by the DW–3 data. Further, the board found and the record shows that the percentage of fines, which is one of the variables used to determine permeability, is similar in both the DW–3 and DH–11 data. *Id.* at 16. This "fine" analysis is a result of the sieve test and is not related to the Moretrench analysis.

Randa also argues that the gradation curves did not indicate an extensive dewatering problem. Randa asserts that the Corps did not appreciate the scope of the problem and Randa concludes from this that the DH–11 gradation curves must not have indicated the problem. However, Randa's argument misses the mark. Given Randa's concession that the DW–3 data reflects the actual conditions, the proper inquiry, as the board recognized, focuses on whether the DW–3 data and the DH–11 data are materially different.

Randa cites *Foster,* 435 F.2d at 886–887, for the proposition that "[f]ailure to discover a latent condition which would have been discoverable only through the performance of studies requiring geological or other technical skills does not bar a differing site conditions claim." However, because we have upheld the board's finding that there was no material difference between the conditions indicated by the contract and the conditions experienced, it follows that there were no latent condi-

tions and that no studies needed to be performed. Thus, we conclude that Randa's argument is misplaced.

e.

■ To summarize, we affirm the board's conclusion that Randa did not prove that there was a Type 1 differing site condition. We do so by determining that: (1) as a matter of law, Randa had a duty to look at the gradation curves; (2) as a matter of law, the contract, including the gradation curves, indicated a dewatering problem characterized by a permeability between seventeen and ninety-nine feet/day; (3) as a matter of law, the Corps was under no heightened duty of disclosure; and (4) the board's factual finding that the site conditions encountered fell within those indicated and, thus, that there was no material difference, is without reversible error. As a result, we need not reach the issue of whether there was a material difference between the conditions actually encountered and those indicated only by the DH–11 boring log, without reference to the DH–11 gradation curves.

### 3. Type 2 Differing Site Condition

As mentioned earlier, FAR 52.236–2 was incorporated into the contract and defines Type 2 differing site conditions as "unknown physical conditions at the site, of an unusual nature, which differ materially from those ordinarily encountered and generally recognized as inhering in work of the character provided for in the contract." 48 C.F.R. § 52.236–2 (2000). The board found that no Type 2 differing site condition existed because there was no unknown condition. *Randa*, slip op. at 20. The board defined an unknown condition as "one that could not have been reasonably anticipated from a site visit and a review of the contract documents, including subsurface information." *Id.* The board then went on to find that the con-

tract required dewatering an unconfined aquifer down to thirty-five feet below the water table and that Randa did not review the gradation curves and other subsurface data that was available. Based on these findings, the board concluded that substantial water should have been reasonably anticipated and, thus, there was no unknown condition and no Type 2 differing site condition.

It is not clear from Randa's first brief to this court what Randa argues or if it even challenges this part of the board's decision. The government noted this in its brief to this court, stating that "[i]t is unclear ... whether [Randa] is appealing the board's ruling on [Randa's] claim for a Type II differing site condition." Randa did not respond to this challenge in its reply brief. In support of the board's decision, the government argues that the proper test is whether Randa could "have anticipated the condition from appearance or general experience," and asserts that Randa "could have anticipated the conditions encountered at the project site."

■ We perform a de novo review of the question of whether the board applied the correct legal standards to determine if a Type 2 condition existed. Our precedent provides that in order to qualify as a Type 2 differing site condition, "the unknown physical condition must be one that could not be reasonably anticipated by the contractor from his study of the contract documents, his inspection of the site, and his general experience[,] if any, as a contractor in the area." *Perini Corp. v. United States*, 180 Ct.Cl. 768, 381 F.2d 403, 410 (1967). It is clear that the board applied at least the first two of the three conditions and found them sufficient to make a decision that no Type 2 condition was proved. It is not clear that the board considered the third condition: the general experience of Randa in the area. However, because Randa has not argued that its

general experience in the area, if any, weighed in favor of finding a Type 2 condition, and does not appear to have presented any such evidence, we find that any possible error by the board in not addressing the third condition is harmless in this case.

The board's application of the above test to the present case is factual in nature. Accordingly, we must uphold it if it is supported by substantial evidence and does not otherwise contain any reversible error. 41 U.S.C. § 609(b) (1994); *Perry,* 47 F.3d at 1137; *Perini,* 381 F.2d at 412, 415. The Court of Claims has opined that proving a Type 2 differing site condition is more difficult than proving a Type 1 differing site condition, involving a heavier burden of proof and a stiffer test. *Charles T. Parker Constr. Co. v. United States,* 193 Ct.Cl. 320, 433 F.2d 771, 778 (1970).

 Again, because Randa has conceded that the DW–3 data reflects the actual conditions encountered, the proper inquiry focuses on whether the DW–3 data shows an unknown condition. It does not. As detailed earlier, the DH–11 data virtually predicted the DW–3 data. Further, although the contract was intended to enable bids to be prepared without a site visit, a representative of Randa did make at least one site visit. *Randa,* slip op. at 12. On that visit, he observed a creek bed, admittedly dry, but nonetheless a possible harbinger of underground water. *Id.* Accordingly, we hold that the board's decision that Randa did not establish that it was subjected to a Type 2 differing site condition is supported by substantial evidence and is not fraudulent, arbitrary, capricious, or grossly erroneous.

## CONCLUSION

We hold that the Board's determination of the absence of either a Type 1 or a Type 2 differing site condition is supported by substantial evidence and does not otherwise contain any reversible error.

*AFFIRMED.*