**ORLOSKY INC., Plaintiff,**

v.

**The UNITED STATES, Defendant.**

**No. 01–634C.**

United States Court of Federal Claims.

Feb. 2, 2005.

Steven R. Lovett, Woodland Hills, CA, for plaintiff.

Timothy P. McIlmail, Washington, DC, with whom was Assistant Attorney General Peter D. Keisler, for defendant. Richard Spector, Naval Facilities Engineering Command, Western Division, of counsel.

## OPINION and ORDER

CHRISTINE O.C. MILLER, Judge.

This case is before the court on defendant's motion for partial summary judgment and plaintiff's cross-motion for summary judgment. After briefing was completed on June 1, 2004, the case did not progress until it was reassigned by the chief judge on December 9, 2004. Axiomatic it may not be, but cases that are neglected and ultimately reassigned are usually more difficult; moreover, the harm wrought by delay is more severe when the case—and this is one—cannot be resolved on aging dispositive motions. Due to the delay, the parties were given an opportunity to supplement the record with any new legal authority, as well as to appear for argument, which has been held.

This dispute concerns a contractor's claim for damages based on alleged numerous delays, contractual breaches, and faulty specifications that caused plaintiff to incur additional uncompensated costs. It also involves a

series of pleaded admissions suggesting gross errors and erroneous assumptions on the part of plaintiff as a bidder, particularly its failure to conduct a pre-bid site inspection. This failure is central to defendant's motion, by which defendant contends that plaintiff cannot recover for a differing site condition when information was discernable by a pre-bid site inspection. Plaintiff takes the position that the Government cannot avoid liability for misrepresenting information in the contract simply because plaintiff failed to confirm basic assumptions regarding the site. These two competing duties collide in this case.

## FACTS

The following facts are undisputed, unless otherwise noted. On November 8, 1995, the United States Department of the Navy (the "Navy") awarded Contract No. N62474–95–C–4778 to Orlosky Inc. ("plaintiff"), a Nevada corporation with its principal place of business in Jamul, California. The contract called for electrical work at San Nicolas Island, Point Mugu Naval Air Weapons Station, in Point Mugu, California. Work to be performed included a coordination study of the electrical high voltage system of San Nicolas Island and replacement of fuses and other electrical apparatuses, as well as resetting of reclosers, which are "switch[es] placed on a pole to provide emergency shut off in case of a short circuit." Declaration of Joseph R. Orlosky, April 14, 2004, ¶ 6. Due to alleged differing site conditions, inaccurate contract specifications, and delays, plaintiff incurred additional costs in performance and filed its certified claim to the contracting officer on November 17, 1997. The contracting officer issued a final decision denying the claim on September 28, 2001.

After the Navy contracting officer denied its claim, plaintiff filed a complaint in the Court of Federal Claims on November 9, 2001, seeking an upward adjustment to its contract in an amount of $565,481.00, plus interest, for plaintiff's forced expenditures and uncompensated overhead caused primarily by differing site conditions and the Navy's failure to provide correct data and specifications, and other delays. Plaintiff also seeks compensatory, incidental and consequential damages, and costs and attorneys' fees. The complaint pleads: (1) breach of contract; (2) equitable adjustment due to differing site conditions; (3) equitable adjustment due to breach of implied warranty; (4) equitable adjustment due to delays; and (5) breach of covenant of good faith and fair dealing.

On April 5, 1995, the Navy issued a pre-solicitation notice entitled "Provide Coordinated Electrical Distribution System For San Nicolas Island, NAWS, Point Mugu, CA." The proposed work "include[d] repairing reclosers, selecting and installing electrical components for identified sections of the feeders in the electrical distribution system, and incidental related work." Parties' Stipulation To Facts ("Stip.") filed Apr. 28, 2004, ¶ 2. The formal solicitation issued on July 7, 1995, originally required work to commence within 15 days after award and to be completed within 120 days. Offers were due August 8, 1995. An amended solicitation extended the completion date to 200 calendar days after the commencement date. The solicitation included a liquidated damages clause.

The solicitation incorporated by reference the "Differing Site Conditions" clause, Federal Acquisition Regulation ("FAR") § 52.236–2 (1984), and the "Site Investigation and Conditions Affecting the Work" clause, FAR § 52.236–3. The Differing Site Conditions clause provides, in part:

The Contractor shall promptly, and before the conditions are disturbed, give a written notice to the Contracting Officer of (1) subsurface or latent physical conditions at the site which differ materially from those indicated in this contract, or (2) unknown physical conditions at the site, of an unusual nature, which differ materially from those ordinarily encountered and generally recognized as inhering in work of the character provided for in the contract.

FAR § 52.236–2(a).

The "Site Investigation and Conditions Affecting the Work" clause provides, in part:

The Contractor acknowledges that it has taken steps reasonably necessary to ascertain the nature and location of the work, and that it has investigated and satisfied

itself as to the general and local conditions which can affect the work or its cost, including but not limited to ... (5) the character of equipment and facilities needed preliminary to and during work performance.... Any failure of the Contractor to take the actions described and acknowledged in this paragraph will not relieve the Contractor from responsibility for estimating properly the difficulty and cost of successfully performing the work[.]

FAR § 52.236–3(a).

The solicitation also included a clause entitled "San Nicolas Island Pre–Bid Site Visitation," which—as parties stipulate—"instructed" and "warned," Stip. ¶ 9, bidders of the following:

Bidders are expected to inspect the site where services are to be performed and to satisfy themselves to all general and local conditions that may affect the cost of performance of the contract to the extent such information is reasonably obtainable. In no event will a failure to inspect the site constitute grounds for withdrawal of a bid after opening or for a claim after award of the contract.

On page one of the solicitation, the Navy notified bidders that a site visit was scheduled to take place on July 26, 1995.

The Navy conducted the site visit as planned, and six other bidders attended. Plaintiff did not attend the inspection, nor did any representatives of plaintiff perform any inspection of the premises at any time prior to bid. Plaintiff was awarded the contract on November 8, 1995.

Sometime after award but before the pre-construction meeting held in December 1995, plaintiff conducted an inspection of the site, which revealed some alarming conditions regarding the reclosers. As best this court can wrest from the record, it appears that reclosers serve the basic function of a circuit breaker. Reclosers can be of at least two types. One is the overhead, pole-mounted type of recloser, which one might see as an electrical box placed high on electrical poles. A second type is a pad-mounted recloser, which usually is placed ground-level in tamper-proof structures. Either recloser requires different installation procedures.

Section 16370 of the contract specified the mode for installing the new reclosers, which plaintiff interprets as requiring overhead pole-type reclosers, consistent with what plaintiff believed to be the pole-mounted reclosers already installed on the island. Section 16370, paragraph 2.4 provides: "Recloser shall be three-pole gang operated, with a padlock arrangement for locking in both open and closed positions." Plaintiff characterizes this provision as discrepant with paragraph 3.1 of the same section, which provides: "Provide installation conforming to requirements of ANSI C2 and CALPUC G.O. 95. Provide material required to make connections into existing system and perform excavating, backfilling, and other incidental labor."

Although the contract called for use of pole-mounted reclosers, plaintiff was alarmed to discover at its post-award site inspection that, as counsel stated in argument, "there were no poles." Defendant has not admitted formally to the type or mounting of the reclosers present. According to plaintiff, the reclosers were located in small buildings, placed on stanchions. The reclosers were the pole-mounted type, but they were installed in a pad-mounted position. Plaintiff contends that the actual conditions regarding the reclosers necessitated a different scope of work than that which the contract specified and that which plaintiff contemplated when submitting its bid.

Plaintiff explains that replacing pole-mounted reclosers involves a simpler scope of work with a corresponding "lower bid price than pad-mounted type reclosers." Orlosky Decl. ¶ 12. Installing pole-mounted reclosers in a pad-mounted condition required welding and engineering work that plaintiff did not contemplate when submitting its bid. *See id.* ¶ 14. According to plaintiff, the Navy "forced" it to perform installation that was "never specified this way in the utility industry[,]" and was "in violation of the PUC and OSHA safety orders[.]" *Id.*

Plaintiff contends that it alerted the Navy to the incorrect specifications regarding the reclosers at the December 4, 1995 pre-construction meeting. Mr. Orlosky correspond-

ed with Phil Benoit, the Resident Officer in Charge of Construction, on February 22, 1996, complaining that it had still not been informed on how to proceed and suggested the Navy consider several technical and safety problems associated with the contract's installation specifications. *See* Pl.'s Ex. 8. Plaintiff recommended the use of the pad-mounted type of reclosers that were suited for this type of installation, *id.,* but the Navy required plaintiff to "fabricate and 'make fit' the reclosers in the buildings in violation of the warranty provisions." Orlosky Decl. ¶ 14.

In addition to the alleged defective specifications regarding the reclosers, plaintiff also claims that the coordination study called for by the contract involved the use of contract specifications and drawings that proved to be defective. Drawings and Dapper data, "vital" to provision of a coordinated electrical system, were defective because they failed to accurately "portray the existing conditions . . . [and] to properly indicate many additions and deletions to the high voltage distribution loads changed over the years by the Navy." *Id.* ¶¶ 30–31. Plaintiff's scope of work then increased because the Navy asked it "verbally to make the necessary corrections to the Dapper data and the contract drawings[.]" *Id.*

While the Navy does not admit to any of these contract deficiencies, it does agree with plaintiff's own admission that the site conditions regarding the reclosers would have been apparent to plaintiff had it conducted a site inspection. Def.'s Response to Am. Proposed Findings of Additional Uncontroverted Facts filed May 17, 2004, ¶ 23. The Navy also denies ever instructing plaintiff to install reclosers in a manner inconsistent with the contract specifications. It insists that "with respect to reclosers, the contract requirements had not changed[,]" and denies that "the reclosers would not fit in the site due to the deviation from specifications[.]" *Id.* ¶¶ 19, 21.

These alleged contract deficiencies, memorialized by plaintiff's submissions, enlarged and, at least allegedly, materially altered the scope of work, as well as extended the amount of time necessary to complete per-

formance. Plaintiff's delay claims involve, however, more than just an extended scope of work. Plaintiff also takes the Navy to task for its failures timely to respond to plaintiff's inquiries regarding how to proceed with the reclosers, as well as to provide plaintiff with the Dapper data. Other allegations, substantiated by plaintiff's submissions, regarding several other Navy-caused delays, include: (1) plaintiff's inability to access the site due to the Navy's alleged failure to notify public works; (2) the Navy's failure to timely schedule outages on the island necessary for plaintiff to perform work and testing; (3) the Navy's actions in stringing plaintiff along throughout the negotiations over plaintiff's requests for adjustment, requests for information, and alleged bad-faith tactics; (4) the Navy's failure to allow plaintiff access to the island to remove its equipment (the Navy claims that plaintiff left its equipment at its own election); and (5) the delays associated with plaintiff's reworking the drawings and data for use in the coordination study, which plaintiff claims to have performed twice.

Readily apparent from the complaint, and common in these types of disputes, is a difficulty in differentiating discrete periods of delay, as well as their effect on critical path. As of April 16, 2004, when Mr. Orlosky signed his declaration prior to the date this case was transferred to the undersigned and argument was heard, the sum total of the delays caused by the Navy was more than 572 days. The Navy by that date still "refused to allow Plaintiff to complete the project" or to terminate the contract. Orlosky Decl. ¶ 49. Accordingly, the Navy has not released plaintiff's performance bond, which has prohibited plaintiff from obtaining bonding for further construction business.

Defendant moved for partial summary judgment against plaintiff's claims for defective site conditions and breach of warranty of specifications, arguing that plaintiff's admission that a pre-bid site inspection would have alerted it to the differing site conditions precludes recovery. Plaintiff cross-moved for summary judgment on all counts.

## DISCUSSION

### I. Standard of review

RCFC 56 provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." RCFC 56(c); see Am. Pelagic Fishing Co. v. United States, 379 F.3d 1363, 1370–71 (Fed.Cir.2004). No genuine issue of material fact exists when a rational trier of fact could only arrive at one reasonable conclusion. See, e.g., Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); Hall v. Aqua Queen Mfg., Inc., 93 F.3d 1548, 1553 n. 3 (Fed.Cir.1996). In such cases no need for a trial is present, and the motion for summary judgment must be granted. Summary judgment, however, will not be granted if "the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable [trier of fact] could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); see also Eli Lilly & Co. v. Barr Labs., Inc., 251 F.3d 955, 971 (Fed.Cir.2001). "[M]atters of law may be decided on motion for summary judgment." Santa Fe Pac. R.R. Co. v. United States, 294 F.3d 1336, 1340 (Fed.Cir.2002).

The initial burden on the party moving for summary judgment to produce evidence showing the absence of a genuine issue of material fact, Crown Operations Int'l, Ltd. v. Solutia Inc., 289 F.3d 1367, 1375 (Fed.Cir. 2002), may be discharged if the movant can demonstrate "an absence of evidence to support the nonmoving party's case[,]" Celotex Corp. v. Catrett, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); see also Trilogy Communications, Inc. v. Times Fiber Communications, Inc., 109 F.3d 739, 741 (Fed. Cir.1997).

The party opposing summary judgment must demonstrate a genuine issue of material fact. It "cannot rest on mere allegations, but must present actual evidence." Crown Operations Int'l, 289 F.3d at 1375. Any doubt over factual issues must be resolved in favor of the party opposing summary judgment, to whom the benefit of all presumptions and inferences runs. Matsushita Elec. Indus. Co., 475 U.S. at 587–88, 106 S.Ct. 1348; Am. Pelagic Fishing Co., 379 F.3d at 1371.

### II. Defendant's motion for partial summary judgment

■ Defendant argues that plaintiff is precluded from maintaining a different site condition claim because it admitted that a pre-bid site inspection would have revealed the type and mounting of the reclosers already installed on the island. The Federal Circuit has held that "[i]t is well-settled that a contractor is charged with knowledge of the conditions that a pre-bid site visit would have revealed." H.B. Mac, Inc. v. United States, 153 F.3d 1338, 1346 (Fed.Cir.1998); see also Randa/Madison Joint Venture III v. Dahlberg, 239 F.3d 1264, 1272 (Fed.Cir.2001) (holding that bidder had duty to examine information "referred to and made available for inspection by the contract documents"). Plaintiff argues that applying H.B. Mac would conflict with equally well-settled law that the Government cannot mislead its contractors. See Flippin Materials Co. v. United States, 160 Ct.Cl. 357, 363, 312 F.2d 408, 412 (1963). Plaintiff cites a case decided by the undersigned, Baldi Bros. Constructors v. United States, 50 Fed.Cl. 74, 79 (2001), stating:

> Where the Government has provided misleading information to a contractor, the Government "is not relieved from liability by general contractual provisions requiring the bidder to investigate the site or satisfy himself of conditions, or stating that the United States does not guarantee the statements of fact in the specifications, etc."

50 Fed.Cl. at 79 (quoting Flippin, 160 Ct.Cl. at 365, 312 F.2d at 413). The site inspection in Baldi, however, would not have revealed the admitted differing site condition. Id. The court in Flippin, relied on in Baldi, also added, in a footnote:

> Although general warnings to visit the site or become acquainted with all information,

etc., will not excuse an affirmative misrepresentation, by defendant, . . . such general warnings cannot be disregarded and must be taken into account in interpreting the specifications and deciding whether there was in fact a misrepresentation.

*Flippin,* 160 Ct.Cl. at 364 n. 7, 312 F.2d at 413 n. 7. The present case does not involve a question of whether plaintiff should have reviewed scientific data regarding subsurface conditions when the contract calls for subsurface work, as it often does. *See, e.g., Randa/Madison Joint Venture III,* 239 F.3d 1264; *H.B. Mac,* 153 F.3d 1338; *Flippin,* 160 Ct.Cl. 357, 312 F.2d 408. Rather, it involves a contractor's obligation to participate in a routine site inspection as called for by the contract. The Navy's failures, if any, accurately to depict site conditions do not equate to misrepresentations where the actual site conditions are discoverable by a required site inspection. Were plaintiff allowed to maintain a differing site condition claim, the purpose of charging plaintiff with knowledge discoverable by a pre-bid site inspection would be defeated.

 Plaintiff's claim based on a differing site condition requires it show "that the conditions actually encountered were 'reasonably unforeseeable based on all the information available to the contractor at the time of bidding.'" *H.B. Mac,* 153 F.3d at 1347 (quoting *Stuyvesant Dredging Co. v. United States,* 834 F.2d 1576, 1581 (Fed.Cir.1987)). The actual conditions related to the reclosers were reasonably foreseeable because a reasonable contractor would have conducted a site inspection before bidding.

Plaintiff is adamant that its differing site conditions claim encompasses more than just defects regarding the type and mounting of the reclosers: "This nonconforming condition with respect to reclosers is virtually the only condition that may have been apparent to the plaintiff's representative had to [sic] undertaken an initial site inspection." Orlosky Decl. ¶ 17. As defendant's argument is limited to the existing recloser type and mounting, it is inappropriate to preclude plaintiff from recovering for any other alleged defect that plaintiff may be able to prove as a differing site condition.

 Defendant argues that plaintiff should also be prevented from stating a separate claim for breach of warranty of contract specifications because *Comtrol, Inc. v. United States,* 294 F.3d 1357 (Fed.Cir.2002), "collapses" plaintiff's claims into one because "the alleged defect in the specification is the failure to disclose the alleged differing site condition." Def.'s Br. filed Mar. 12, 2004, at 3. In *Comtrol* a contractor unexpectedly encountered quicksand at the construction site. The contractor claimed that the presence of quicksand both constituted a differing site condition, as well as a defect in the design specifications for failure to disclose. The Federal Circuit held that, "where the alleged defect in the specification is the failure to disclose the alleged differing site condition[,]" and "[w]here the differing site conditions claim and the defective specifications claim are so intertwined as to constitute a single claim, that claim will be governed by the specific differing site conditions clause and the cases under that clause." *Comtrol,* 294 F.3d at 1362.

*Comtrol* does dictate a result in this case insofar as an identical claim exists between plaintiff's breach of warranty of specifications claim and the differing site conditions claim. However, plaintiff also contends that "the mode of installation required by the Navy violates safety regulations and manufacturer's warranties." Orlosky Decl. ¶ 8. This assertion constitutes a disputed fact. Installing pole-mounted reclosers in a pad-mounted condition involved an alleged highly unusual procedure that was not up to code, requiring engineering work not contemplated by plaintiff's bid. Because no reasonable contractor could have anticipated that the Navy would direct it to install the apparatuses in violation of safety regulations or a manufacturer's warranty, plaintiff charges that the Navy supplied defective specifications. Trial will be required to resolve this dispute.

Plaintiff's counsel stated at argument that, even had plaintiff attended the pre-bid site inspection, it would still not have been alerted to any problems regarding the reclosers because it would have assumed that poles would be installed by the Navy. Although this assertion is speculative, the Navy's con-

duct requiring its contractor to install the reclosers in violation of manufacturer's warranty could constitute a form of defective specifications. *Comtrol* thus would not necessarily preclude plaintiff from recovering costs under a defective specification theory that is grounded on what plaintiff could not have reasonably foreseen even if charged with knowledge ascertainable from a pre-bid site inspection.

### III. *Plaintiff's cross-motion for summary judgment*

Plaintiff failed to discharge its burden on its cross-motion for summary judgment on all counts. RCFC 56(c) requires a party to prove its entitlement as a matter of fact and law. As defendant complains, plaintiff merely made assertions of its entitlement. Counts two and three have been addressed above.

■ As to plaintiff's delay claim, a genuine dispute is present as to whether defendant actually caused some or all of the delays. Plaintiff has the burden to prove "the extent of the alleged delay, the causal link between the government's wrongful acts and the delay in the contractor's performance, and the alleged harm to the contractor for the delay." *Kinetic Builder's Inc. v. Peters*, 226 F.3d 1307, 1316 (Fed.Cir.2000). Plaintiff must show that the Government's conduct "affected activities on the critical path[.]" *Id.* at 1317. Plaintiff's delay expert, Alan Cade, indicated that a portion of plaintiff's delay was a "pacing delay," where the contractor purposely delays performance to match the Navy's already delayed schedule. Deposition of Alan Cade, Nov. 14, 2003, at 43–45. Mr. Cade stated in deposition that Plaintiff delayed submitting its quality control plan because it would have been pointless to do so until it received accurate information from the Navy. According to Mr. Cade, this is a compensable pacing delay; however, this pacing delay analysis has not been recognized by this circuit as a method of proving causation.

■ Plaintiff's attempt to invoke the "Eichleay formula" for recovery of overhead costs cannot proceed until plaintiff proves that (1) the Government caused a delay of uncertain duration, (2) the delay forced extension of the completion date of the project or the contractor incurred additional costs because it planned to finish earlier, and (3) the contractor must have been "on standby and unable to take on other work during the delay period." *Nicon, Inc. v. United States*, 331 F.3d 878, 883 (Fed.Cir.2003). Periods of alleged delay are non-recoverable where the contractor caused a concurrent delay or where the contractor was not in standby status. *Sauer Inc. v. Danzig*, 224 F.3d 1340, 1348 (Fed.Cir.2000). Plaintiff must distinguish delays caused by the Navy versus those caused by itself. *Id.*

■ Plaintiff's admissions are problematic to its delay claim. In particular, plaintiff stipulated that on August 27, 1996, it informed the Navy that it "'elected not to demobilize [its] equipment ... until the Government has had the opportunity to respond to [its] request for information.'" Stip. ¶ 40. Such an election may preclude recovery for plaintiff's delay claim associated with defendant's alleged failure to allow plaintiff to remove equipment from the site.

Plaintiff faults the Navy for numerous isolated instances that caused delay. Those regarding delays associated with dilatory responses to outage requests; failure to timely allow plaintiff access to the site and the Dapper data, as well as its equipment; and failure to allow plaintiff to complete performance, which are duplicated in other counts, are valid claims to be tried. Also unnecessarily duplicated in plaintiff's breach claim is the delay caused by the alleged necessity to complete a second coordination study, which also will be an issue for trial.

### CONCLUSION

Accordingly, based on the foregoing,

**IT IS ORDERED**, as follows:

1. Defendant's motion for partial summary judgment is granted with respect to plaintiff's differing site condition claim and claim for breach of warranty of fitness of specifications as they relate to the type and mounting of the reclosers encountered on site and otherwise is denied.

2. Plaintiff's cross-motion for summary judgment is denied.

3. Pursuant to Rule 56(d), all facts discussed that are undisputed are deemed facts without substantial controversy, in addition to those facts not appearing above, but that have been stipulated by the parties as non-controverted. The following non-exclusive matters are considered actually and in good faith controverted: whether a differing site condition exists apart from the identity or actual mounting of the reclosers, whether the contract specifications were deficient regarding matters outside of the mounting of the reclosers, whether plaintiff suffered any delays caused by the Navy's conduct, whether plaintiff was required to complete a second coordination study, whether the Navy delayed plaintiff's entry to the work site, whether the Navy prohibited or unreasonably restricted plaintiff's ability to remove its equipment, whether the Navy required plaintiff to install reclosers in a manner in violation of safety regulations and voiding the manufacturer's warranty, and whether the Navy acted in bad faith regarding plaintiff's requests for information and requests for equitable adjustment.

4. A scheduling order entered previously.