ARMED SERVICES BOARD OF CONTRACT APPEALS

Appeal of -- )
)
Tidewater, Inc. ) ASBCA No. 61076
)
Under Contract No. W9126G-09-D-0111 )

APPEARANCES FOR THE APPELLANT: Elizabeth Haws Connally, Esq.
 Connally Law, PLLC
 San Antonio, TX

 William W. Sommers, Esq.
 Langley & Banack, Inc.
 San Antonio, TX

APPEARANCES FOR THE GOVERNMENT: Michael P. Goodman, Esq.
 Engineer Chief Trial Attorney
 S. DeAnn Lehigh, Esq.
 Michael T. Geiselhart, Esq.
 Engineer Trial Attorneys
 U.S. Army Engineer District, Little Rock

## OPINION BY ADMINISTRATIVE JUDGE YOUNGER ON THE GOVERNMENT'S MOTION FOR SUMMARY JUDGMENT

The United States Army Corps of Engineers (the Corps) has moved for summary judgment in this appeal, in which appellant Tidewater, Inc. (Tidewater) asserts that it encountered a Type I differing site condition. In particular, Tidewater alleges that soil conditions when it sought to install piers, and to obtain fill, for a building addition differed materially from those indicated in contract documents due to excessive rainfall, forcing it to change its construction method and incur additional performance time. The Corps argues that Tidewater has failed to allege essential elements of a Type I differing site condition, including the element of identification of the contract indications that form the basis of its claim. We grant the motion and deny the appeal.

## STATEMENT OF FACTS FOR PURPOSES OF THE MOTION

1. By date of September 30, 2009, the Corps awarded Tidewater Contract No. W9126G-09-D-0111 (the base contract), a multiple award, indefinite-delivery, indefinite-quantity, task order contract under which awardees were to provide all labor and equipment for repairs, alterations, construction and design-build of healthcare facilities for

the U.S. Air Force Medical Services, U.S. Army Medical Command and other Corps of Engineers' customers with healthcare needs (R4, tab 4 at 2-3 of 37).

2. The contract contained various standard clauses, including Federal Acquisition Regulation (FAR) 52.236-2, DIFFERING SITE CONDITIONS (APR 1984); FAR 52.236-3, SITE INVESTIGATION AND CONDITIONS AFFECTING THE WORK (APR 1984); and FAR 52.243-4, CHANGES (JUN 2007) (R4, tab 4 at 13 of 27).

3. By date of July 27, 2012, the Corps issued Request for Proposal (RFP) No. W9126G-12-U-1016-0001 to Tidewater and other awardees, seeking proposals relating to a task order for the Barksdale Dental Clinic Project, to "create a complete and usable facility" (app. supp. R4, tab 1 at 1). The RFP included Attachment G, "Site Surveys, Geotechnical Reports & Fill Material," which states in part: "*The Contractor shall be responsible for providing all site surveys, geotechnical data, and fill material required for construction and or utility installation.* This includes obtaining all necessary permits and soil testing. Any existing surveys provided are for information only (FIO)." (*Id.* at 51) In section 2.5, "Regional Setting," the RFP described the soils as composed of alluvial deposits of clay, silt and sand with varying bearing capacity. Section 2.5 also provided that "water table elevation is often high." (*Id.* at 768)

4. It is undisputed that Tidewater participated in site visits on July 23, 2012, and August 10, 2012 (compl. and answer ¶ 13).

5. By date of August 16, 2012, the Corps issued Amendment No. 0003 to the RFP, requesting contractors to respond with proposals to "create a complete and usable facility" for the dental unit that would occupy the designated space (app. supp. R4, tab 1 at 1307). The Corps stated that "[t]he magnitude of this requirement is estimated over $5,000,000.00" (*id.*).

6. The amendment included Design Compatibility Guidelines promulgated by the Air Force for work performed at Barksdale Air Force Base. The guidelines added that a "geotechnical report including...design recommendations by a qualified geotechnical engineer is required." (App. supp. R4, tab 1 at 768) The guidelines also advised contractors that "[r]ainfall averages 46.6 inches annually, with the greatest monthly rainfall occurring in spring" (*id.* at 769).

7. Effective September 30, 2012, the Corps awarded Tidewater Task Order No. 0002, which gave rise to the present dispute. Under Task Order No. 0002, Tidewater was to renovate Building 4666 at Barksdale Air Force Base, Louisiana, over a performance period of 730 calendar days. (R4, tab 5 at 141-42, 146-47)

2

8. By date of December 20, 2012, the contracting officer issued Modification No. 02 to exercise Option 3 under the task order contract for the construction of an addition to Building 4666 (R4, tab 6 at 1-2).

9. By date of February 25, 2013, Professional Service Industries, Inc. (PSI), Tidewater's geotechnical engineering consultant, furnished its report to Tidewater, which the parties have referred to as the Geo Report. While Tidewater alleges that it "became a contract-related document" (compl. ¶ 44), we find that the Geo Report was not a contract document, but was commissioned by Tidewater consistent with Attachment G of the RFP (*see* statement 3). We further find that the report was addressed to Tidewater and the record contains no evidence that the Corps endorsed the report's contents. In pertinent part, PSI stated in the Geo Report that:

> Groundwater was observed at 19 feet in boring B-1 on completion of the borings [in February 2013]. Groundwater may be present at different depths during other times of the year depending upon drainage pattern alterations, climatic and rainfall conditions. PSI recommends the contractor determine the current groundwater depth at the time of construction.

(R4, tab 3C at 21, 30) PSI also stated that "groundwater levels may require dewatering operations be performed to allow drilled shaft construction or the shafts may have to be installed by slurry drilling methods" (*id.* at 23). PSI further recommended that Tidewater's contractor "determine the actual groundwater levels at the site at the time of construction to assess the impact groundwater may have on construction" (*id.* at 25).

10. By letter to Tidewater dated May 9, 2013, the Corps suspended work because "insufficient project funds [were] immediately available" (R4, tab 10 at 392-93). Approximately seven months later, by letter to Tidewater dated December 11, 2013, the administrative contracting officer stated that, "[e]ffective with the signing of Modification No. 06 by the Contracting Officer, the directed suspension of work was lifted and work shall again proceed" (*id.* at 394).

11. It is undisputed that, as approved by the Corps, Tidewater's final design for the construction of the addition to Building 4666 included use of straight shaft concrete piers for the foundation (compl. and answer ¶ 20).

12. By letter to the administrative contracting officer dated June 17, 2015, Tidewater gave notice of a differing site condition, which it described as follows:

During the pier drilling activity conducted on June 9, 2015 it was discovered that the water table has risen drastically since our initial investigation which was conducted in 2013. This initial investigation encountered groundwater approximately 20 feet below the surface. Currently, the groundwater level is at approximately 9 feet below the surface.

(R4, tab 3i at 90)

13. By letter to Tidewater dated July 7, 2015, the administrative contracting officer responded, disagreeing that Tidewater had encountered a differing site condition. The administrative contracting officer cited from the Geo Report (*see* statement 9) and concluded that "encountering groundwater was a known potential condition" that Tidewater's pier drilling contractor should have anticipated, and blamed Tidewater both for failing to ascertain water table levels before commencing pier drilling operations, and for failing to take other recommended measures. (R4, tab 3k) Thereafter, by letter to the administrative contracting officer dated July 20, 2015, Tidewater advised:

On July 15, 2015, PSI conducted a test well to verify the current conditions of the water levels at the site. During the drilling of the test shaft, water was encountered at approximately 7 to 9 feet below the surface; when measured it was at 7'-6." Based on these latest findings, Tidewater recommends that the helical method be used in place of the drilled concrete piers.

(R4, tab 3j at 92) Tidewater stated that its structural engineer had been on site and had witnessed the problems and determined that "piers will need to be installed utilizing the slurry method if we are to continue with the install, or we must wait for [the] groundwater [to] diminish to a manageable level" (R4, tab 3i at 90). Thereafter, Tidewater changed its contemplated method for pier installation and was ultimately able to complete pier installation using helical piers (R4, tab 10 at 273).

14. By date of July 26, 2016, Tidewater submitted a certified claim to the contracting officer for $726,669.27, together with 215 additional calendar days of delay, for a Type I differing site condition and weather delays allegedly encountered on the project (R4, tab 10). Tidewater asserted that the differing site condition "caused [it] to change the design for the pier installation and required additional time to perform the work" (*id.* at 1).

15. As a separate part of its claim, Tidewater asserts that it was delayed 40 calendar days because it was unable to obtain the select fill that it needed due to wet

4

conditions at the supplier's pit, resulting in higher moisture content than anticipated (R4, tab 10 at 276-80).

16. By final decision dated December 14, 2016, the contracting officer denied Tidewater's claim in its entirety (R4, tab 3 at 7-8). By notice of appeal dated February 27, 2017, Tidewater filed this timely appeal.

17. Tidewater filed its original complaint in April 2017 and an amended original complaint in July 2017. We find that, in both pleadings, Tidewater does not allege that the Corps made specific representations in the contract documents regarding subsurface soil conditions. We further find that, in both pleadings, Tidewater alleges that, with respect to groundwater, the contract documents contain only the representation in section 2.5 of the RFP (*see* statement 3).

18. In its original complaint, Tidewater alleged that, when it was ready to construct Building 4666 in the spring of 2015, the weather:

> [W]as the fifth wettest month on record for the Shreveport and Bossier City, LA area, with 10.97 inches of rainfall, which caused the Red River to rise 30-[feet] above flood stage for the first time since 1990. This was not merely a "recent rain" event, but was an event that affected the subsurface soils and high water table in the Shreveport and Bossier City, LA area. The subsurface soil at the time of construction was further saturated by the fact that the Red River at Shreveport rose to its highest level in 70 years, peaking on June 9, 2015 at 37.14 feet, which is 7.14 feet above flood stage. The subsurface physical conditions of the soils were significantly saturated and materially different from what Tidewater reasonably anticipated when it bid on the Project in August 2012 and from the information contained in the Contract and contract-related documents, which included the Geo Report [*see* statement 9]. These conditions also affected Tidewater's ability to obtain acceptable fill for the Project.

(Compl. ¶ 21) (Citations omitted) In its answer, the Corps denied these allegations (answer ¶ 21). Tidewater subsequently filed an amended original complaint, repeating verbatim the allegations of paragraph 21 of the original complaint.

19. As exhibit 1 to its motion, the Corps has presented climate data reflecting that the average annual precipitation for rainfall between 1981 and 2010 in the

5

Shreveport, Louisiana, area was 51.36 inches (Respondent's Motion for Summary Judgment and Brief in Support (gov't mot.), ex. 1 at 2).

## DECISION

In moving for summary judgment, the Corps advances three broad arguments. First, the Corps contends that Tidewater has failed to allege facts necessary to establish each of the elements of a Type I differing site conditions claim. Second, the Corps urges that Tidewater impermissibly relies upon an increase in the water table due to rain occurring *after* contract formation. Third, the Corps argues that Tidewater has not complied with the Site Investigation clause (*see* statement 2) because it neither made site surveys nor performed soils testing. (Gov't mot. at 7)

For its part, Tidewater chiefly argues that triable issues preclude summary judgment. Tidewater asserts that, when it began performance in 2015, it encountered "unforeseeable and unexpected high groundwater levels" that were "materially different from those represented in the Contract documents" (Appellant's Response in Opposition to Respondent's Motion for Summary Judgment (app. opp'n)). While acknowledging the general rule that the Differing Site Conditions clause does not shift the risk of severe weather, Tidewater asserts that "when severe weather makes the specified performance impossible, a changed condition does exist, and the Government has been held responsible" (app. opp'n at 9-10).

We evaluate the parties' contentions by familiar standards. Summary judgment is properly granted only where there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. *E.g., Mingus Constructors, Inc. v. United States*, 812 F.2d 1387, 1390 (Fed. Cir. 1987). "Our task is not to resolve factual disputes, but to ascertain whether material disputes of fact – triable issues – are present." *Conner Bros. Construction Co.*, ASBCA No. 54109, 04-2 BCA ¶ 32,784 at 162,143, *aff'd, Conner Bros. Construction Co. v. Geren*, 550 F.3d 1368 (Fed. Cir. 2008) (quoting *John C. Grimberg Co.*, ASBCA No. 51693, 99-2 BCA ¶ 30,572 at 150,969). In deciding a summary judgment motion, we resolve all reasonable inferences in favor of the non-moving party, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986), which in this case is Tidewater.

Tidewater alleges that it encountered a Type I differing site condition. A Type I condition consists of "subsurface or latent physical conditions at the site which differ materially from those indicated in this contract." FAR 52.236-2(a)(1). In *Comtrol, Inc. v. United States*, 294 F.3d 1357, 1362 (Fed. Cir. 2002), the Federal Circuit defined the components of a Type I differing site condition as follows:

> To establish entitlement to an equitable adjustment due to a
> Type I differing site condition, a contractor must prove, by
> preponderant evidence, that: the conditions indicated in the

contract differ materially from those actually encountered during performance; the conditions actually encountered were reasonably unforeseeable based on all information available to the contractor at the time of bidding; the contractor reasonably relied upon its interpretation of the contract and contract-related documents; and the contractor was damaged as a result of the material variation between expected and encountered conditions.

After careful consideration of the motion papers, we conclude that the motion must be granted. We reach this conclusion for three principle reasons.

*First*, Tidewater appears to seek recovery under the Differing Site Conditions clause for weather conditions. Thus, Tidewater alleges in its original complaint that, when it was ready to construct the addition to Building 4666 in the spring of 2015, it encountered "the fifth wettest month on record for the...area, with 10.97 inches of rainfall, which caused the Red River to rise 30-[feet] above flood stage.... This was not merely a 'recent rain' event, but was an event that affected the subsurface soils and high water table in the...area." (Statement 18) Tidewater alleges that the soils were "significantly saturated" and "materially different" in 2015 from what it anticipated when it bid the project in August 2012, and that the rain affected its ability to "obtain acceptable fill" for the project (*id.*).

Resolving all inferences regarding these allegations in Tidewater's favor on summary judgment, *Liberty Lobby*, 477 U.S. at 255, we do not regard them as dispositive. We adhere to the rule that:

> Generally, the government, under the standard Differing Site Conditions [clause], does not assume an obligation to compensate a contractor for additional costs or losses it incurs resulting solely from weather conditions, which neither party expected or could anticipate and not from any act or fault of the government. Weather conditions generally are considered to be acts of God.

*Turnkey Enterprises, Inc. v. United States*, 597 F.2d 750, 754 (Ct. Cl. 1979). Our own cases apply this principle. *E.g., Commercial Contractors Equipment, Inc.*, ASBCA No. 52930 *et al.*, 03-2 BCA ¶ 32,381 at 160,255 (citing *Turnkey*, 597 F.2d at 759) (holding that "weather occurring during contract performance, no matter how severe, and other acts of God alone do not fall within the provisions of the Differing Site Conditions...clause"); *Praxis-Assurance Venture*, ASBCA No. 24748, 81-1 BCA ¶ 15,028 at 74,356 (same); *Reinhold Construction, Inc.*, ASBCA No. 23770, 79-2 BCA ¶ 14,123 at 69,482 (same).

In its brief, Tidewater acknowledges the general rule that the risk of severe weather "is not shifted to the Government via the [Differing Site Conditions] clause," but it nonetheless argues that "when severe weather makes the specified performance impossible, a changed condition does exist, and the Government has been held responsible" (app. opp'n at 9-10). Tidewater relies upon two cases – *Baldi Bros. Constructors v. United States*, 50 Fed. Cl. 74 (2001); and *D.H. Dave and Gerben Contracting Co.*, ASBCA No. 6257, 1962 BCA ¶ 3493—which we regard as inapposite.

Both cases involved significant omissions from contract documents that have no parallel in the record here. In *D.H. Dave*, we acknowledged that "excessive rainfall is not in and of itself a [differing site condition] for which price and time adjustments are to be made." *D.H. Dave*, 1962 BCA ¶ 3493 at 17,837. We nonetheless awarded an equitable adjustment on a record showing that contract drawings that "omitted information on water and [the] offensive odor of the soil [that the contractor argued] would have disclosed the job to be a 'water job' and that if disclosed" would have caused the contractor to increase its bid substantially. *Id.* at 17,827. Despite the information omitted from the contract documents, the specification required the contractor to achieve 95 percent compaction of the original soil and fill. As a result of heavy rainfall, "the subsurface of the site became saturated due to [an] inadequate drainage area and compaction [to 95 percent] became impossible." *Id.* at 17,837. We concluded that the information omitted from the drawings, "when coupled with the compaction requirements in the specifications...resulted in a misrepresentation of subsurface conditions." *Id.* In *Baldi Bros.*, the other case that Tidewater principally relies upon, the Court of Federal Claims held that "the construction site was largely wetlands, which was not ascertainable from the contract specifications or other information provided by the contract bid documents, or a site inspection." *Baldi Bros.*, 50 Fed. Cl. at 79. Here, the record shows that there were no comparable omissions.

*Second*, Tidewater has failed to allege a Type I differing site condition because it does not allege what contract indications, if any, regarding subsurface soil conditions constitute the predicate for its claim. It is familiar that "[a] contractor is not eligible for an equitable adjustment for a Type I differing site condition unless the contract indicated what that condition would be." *Comtrol*, 294 F.3d at 1363 (citing *P.J. Maffei Bldg. Wrecking Corp. v. United States*, 732 F.2d 913, 916 (Fed. Cir. 1984)). "As a threshold matter,...[a Type I]...Differing Site Conditions claim is dependent on what is 'indicated' in the contract." *P.J. Maffei*, 732 F.2d at 916. It is not evident from Tidewater's two complaints what the contract indications are that it relies upon.

Tidewater's core allegation in its original complaint and amended original complaint is that, when it undertook construction in 2015, "[t]he subsurface physical conditions of the soils were significantly saturated and materially different from what Tidewater reasonably anticipated when it bid on the Project in August 2012 and from the information contained in the Contract and contract-related documents, which

8

included the Geo Report" (statement 18). Significantly, Tidewater does not identify the specific representation in "the Contract and contract-related documents" that it relies upon. Likewise, in responding to the Corps' motion, Tidewater asserts that "[t]he unforeseeable and unexpected high groundwater levels...were materially different from those represented in the Contract documents," but again does not point to a specific statement in those documents. (App. opp'n at 9)

Tidewater also alludes to the Geo Report. But we reject Tidewater's argument that the Geo Report constitutes a contract document. As we have found, the report was not provided to Tidewater with the contract, but was commissioned by Tidewater after award, and was addressed to Tidewater (statement 9). There is no evidence that the Corps endorsed the report's contents (*id.*). *Cf. McDevitt Mechanical Contractors, Inc. v. United States*, 21 Cl. Ct. 616, 618-20 (1990) (holding inaccurate shop drawings produced by contractor and approved by government were not contract indications where contractor was responsible for verifying dimensions shown on drawings). In any event, even if it were a contract document, the Geo Report does not support Tidewater's position. The Geo Report did not tell Tidewater that groundwater would be at a particular depth—it instead warned of varying groundwater depths and recommended that Tidewater "determine the current groundwater depth at the time of construction" (statement 9).

Tidewater also points to the asserted discrepancy between statements in the RFP regarding the extent of rainfall, and the rainfall that it actually encountered. In particular, Tidewater points to the statement in section 2.5 of the Design Compatibility Guidelines that that "[r]ainfall averages 46.6 inches annually" (statement 6). Tidewater asserts that rainfall data presented by the Corps, which reflects annual precipitation of 51.36 inches between 1981 and 2010 (*see* statement 19) "is a higher amount than represented by the Government in the RFP" (app. opp'n at 9). Tidewater adds that the "unforeseeable and unexpected high groundwater levels encountered by Tidewater at the Project site were materially different from those represented in the Contract documents and were unusual in nature and not as Tidewater reasonably expected at the time of bidding" (*id.*).

The statement in the guidelines is not on its face a warranty regarding future rainfall. By its terms, it purports to be no more than a cautionary note regarding annual average of rainfall in the past. We cannot read it either as a warranty that there will be 46.6 inches of rainfall annually during contract performance, or that the average annual rainfall will not exceed 46.6 inches annually.

*Third*, other considerations militate in favor of summary judgment. Among them is that the present record contains no evidence of reliance. "It is well-established that a crucial element of...a differing site conditions claim...is reliance." *Comtrol*, 294 F.3d at 1363. "To prevail on a differing site conditions claim, the contractor must show reliance on the representations in the contract." *Id.* (citing *H.B. Mac, Inc. v.*

9

*United States*, 153 F.3d 1338, 1345 (Fed. Cir. 1998)); *see also Pacific Alaska Contractors, Inc. v. United States*, 436 F.2d 461, 469 (Ct. Cl. 1971) (holding that, to prevail on a Type I claim, contractor must adduce proof of "indications which induced reasonable reliance by the successful bidder that subsurface conditions would be more favorable than those encountered"); *Totem Construction Co.*, ASBCA No. 35985, 91-1 BCA ¶ 23,585 at 118,261 (holding that a Type I claimant "must have relied on the indications of the subsurface conditions in the contract"). It follows that, when Tidewater cannot identify the contract indications regarding subsurface soil conditions that constitutes the predicate for its claim, then it cannot "show reliance on the representations in the contract." *Comtrol*, 294 F.3d at 1363.

Similarly militating in favor of summary judgment is the interpretation of the Differing Site Conditions clause "to apply only to conditions existing when the contract was executed," not after award. *Olympus Corp. v. United States*, 98 F.3d 1314, 1318 (Fed. Cir. 1996) (denying recovery under clause for additional costs of post-award oil spill and strike); *R.L. McDonnell Construction*, ASBCA No. 56262, 12-2 BCA ¶ 35,172 at 172,589 (finding no basis for differing site conditions claim that was not based on "conditions existing at the jobsite at the time of contract award"). Here, Modification No. 02 was issued in December 2012 (statement 8) but the alleged differing site condition did not appear until June 2015 (statement 12).

## CONCLUSION

The government's motion for summary judgment is granted. The appeal is denied.

Dated: November 2, 2018

ALEXANDER YOUNGER
Administrative Judge
Armed Services Board
of Contract Appeals

I concur

RICHARD SHACKLEFORD
Administrative Judge
Acting Chairman
Armed Services Board
of Contract Appeals

I concur

OWEN C. WILSON
Administrative Judge
Vice Chairman
Armed Services Board
of Contract Appeals

I certify that the foregoing is a true copy of the Opinion and Decision of the Armed Services Board of Contract Appeals in ASBCA No. 61076, Appeal of Tidewater, Inc., rendered in conformance with the Board's Charter.

Dated:

JEFFREY D. GARDIN
Recorder, Armed Services
Board of Contract Appeals

11