# ARMED SERVICES BOARD OF CONTRACT APPEALS

Appeal of -- )
)
Columbia State Bank ) ASBCA No. 59531
  (formerly Appeal of Castle-Rose, Inc.) )
)
Under Contract No. W912DW-10-C-0015 )

APPEARANCE FOR THE APPELLANT:    Erich M. Paetsch, Esq.
        Saalfeld Griggs PC
        Salem, OR

APPEARANCES FOR THE GOVERNMENT:    Thomas H. Gourlay, Jr., Esq.
        Engineer Chief Trial Attorney
        Ian D. Clunies-Ross, Esq.
        Engineer Trial Attorney
        U.S. Army Engineer District, Seattle

## OPINION BY ADMINISTRATIVE JUDGE O'SULLIVAN ON APPELLANT'S MOTION FOR SUMMARY JUDGMENT

This appeal arises from a contracting officer's (CO's) final decision (COFD) denying the claim of Castle-Rose, Inc. (CRI), for costs of a constructive change, differing site conditions, government-caused delays, and expert consulting fees incurred on a contract for construction of new buildings at the Howard Hanson Dam in Cumberland, Washington.[1] CRI has moved for summary judgment on entitlement as to each claim item. For the reasons stated below, we deny the motion.

## STATEMENT OF FACTS (SOF) FOR PURPOSES OF THE MOTION

1. On 19 May 2010, the U.S. Army Corp of Engineers, Seattle District (Corps or government) awarded Contract No. W912DW-10-C-0015 (contract) to CRI for the construction of an administration building and an addition to the existing maintenance building at the Howard Hanson Dam (HHD) Facility in Cumberland, Washington. The contract included multiple contract line item numbers (CLINs) for a total firm-fixed-price of $2,288,900. (R4, tab 3 at 3-4, 9[2]) CRI was required to furnish all labor, materials and

---

[1] CRI subsequently entered into Chapter 7 bankruptcy proceedings, and the Bankruptcy Court assigned its claim to Columbia State Bank, which entered its appearance as the real party in interest authorized to pursue the appeal on behalf of the bankruptcy estate (*see* SOF ¶¶ 23-24).

[2] Citations to the Rule 4 file are to the consecutively-numbered pages unless otherwise indicated.

equipment on the project in accordance with the drawings and technical specifications incorporated into the contract (*id.* at 3).

2. The contract incorporated the following standard Federal Acquisition Regulation (FAR) clauses: 52.233-1, DISPUTES (JUL 2002); 52.236-2, DIFFERING SITE CONDITIONS (APR 1984); 52.236-3, SITE INVESTIGATION AND CONDITIONS AFFECTING THE WORK (APR 1984); 52.242-14, SUSPENSION OF WORK (APR 1984); and 52.243-4, CHANGES (JUN 2007) (R4, tab 3 at 24).

3. FAR 52.236-2, DIFFERING SITE CONDITIONS (APR 1984) provides, in relevant part, that:

> (a) The Contractor shall promptly, and before the conditions are disturbed, give a written notice to the Contracting Officer of (1) subsurface or latent physical conditions at the site which differ materially from those indicated in this contract, or (2) unknown physical conditions at the site, of an unusual nature, which differ materially from those ordinarily encountered and generally recognized as inhering in work of the character provided for in the contract.

> (b) The Contracting Officer shall investigate the site conditions promptly after receiving the notice. If the conditions do materially so differ and cause an increase or decrease in the Contractor's cost of, or the time required for, performing any part of the work under this contract, whether or not changed as a result of the conditions, an equitable adjustment shall be made under this clause and the contract modified in writing accordingly.

4. FAR 52.243-4, CHANGES (JUN 2007) provides, in relevant part, that:

> (b) Any other written or oral order (which, as used in this paragraph (b), includes direction, instruction, interpretation, or determination) from the Contracting Officer that causes a change shall be treated as a change order under this clause....

> ....

> (d) If any change under this clause causes an increase or decrease in the Contractor's cost of, or the time required for, the performance of any part of the work under this contract, whether or not changed by any such order, the

2

Contracting Officer shall make an equitable adjustment and modify the contract in writing.

5. FAR 52.242-14, SUSPENSION OF WORK (APR 1984) provides, in relevant part, that:

> (b) If the performance of all or any part of the work is, for an unreasonable period of time, suspended, delayed, or interrupted (1) by an act of the Contracting Officer in the administration of this contract, or (2) by the Contracting Officer's failure to act within the time specified in this contract (or within a reasonable time if not specified), an adjustment shall be made for any increase in the cost of performance of this contract (excluding profit) necessarily caused by the unreasonable suspension, delay, or interruption, and the contract modified in writing accordingly. However, no adjustment shall be made under this clause for any suspension, delay, or interruption to the extent that performance would have been so suspended, delayed, or interrupted by any other cause, including the fault or negligence of the Contractor, or for which an equitable adjustment is provided for or excluded under any other term or condition of this contract.

6. The contract also included "SPECIAL CONTRACT REQUIREMENTS" clauses, denoted by "SC." Clause SC-1, a variation of FAR clause 52.211-10, COMMENCEMENT, PROSECUTION, AND COMPLETION OF WORK (APR 1984), required CRI to complete work on the project no later than 365 days after receipt of the notice to proceed (R4, tab 3 at 35).

7. Clause SC-8, substantially similar to FAR 52.236-4, PHYSICAL DATA (APR 1984), provides, in relevant part, that:

> (a) <u>Physical Conditions:</u> The indications of physical conditions on the drawings and in the specifications are the result of site investigations by surveys, test holes and soil exploration data. Soils boring logs are included with the drawings. This data is furnished for information only. Variations may exist in the subsurface between sample locations.

(R4, tab 3 at 37) Paragraph 1.5, of section 02300 of the contract specifications entitled "EARTHWORK," states that subsurface soil boring logs are depicted in the drawings and provide the best information available (*id.* at 296).

3

8. Clause SC-17, entitled "FIELD OFFICE OVERHEAD (Jul 2006)," required CRI to select an accounting practice in its bid that would be applicable to any change orders, modifications, and requests for equitable adjustment. CRI was required to select an accounting practice based upon either a per diem rate in accordance with clause SC-18, a percentage markup in accordance with clause SC-19, or some other allowable FAR accounting practice. (R4, tab 3 at 40) Pursuant to clauses SC-18 and SC-19, CRI is entitled to receive an equitable adjustment "for any change to the contract…for which the Government is responsible, and which causes either an increase or decrease in [CRI's] costs as to time or performance under the contract. Under such an equitable adjustment, [CRI's] field office overhead shall be an allowable cost, in accordance with [CRI's] accounting practice." (*Id.* at 40-41)

9. In a response, tracked as ID 3211560, to a potential offeror's pre-award inquiry "Is woody debris noted in the bor[ing] log to be hauled off?," the government stated that the "[s]ite consists of spoil material from original Dam construction. There is no expectation to have significant over-excavation or to haul this material off." (R4, tab 5 at 1437)

10. On 27 May 2010, a Notice to Proceed (NTP) was forwarded to CRI to begin work under the contract, effective 1 June 2010. CRI acknowledged receipt of the NTP on 28 May 2010. (R4, tab 7)

11. On 23 July 2010, the government issued a Request for Proposal (RFP) to CRI, requesting a proposal to add work to the contract relating to the installation of a domestic water well and pump. The RFP referenced a statement of work (SOW) entitled "HHD Well Water."[3] (R4, tab 24 at 2873-96) The scope of work under paragraph 1.1 of the SOW was summarized, in part as: "The well is to support new dam facilities that will be constructed in the near future. The well is anticipated to be drilled and installed to 250 ft below ground surface (bgs). However, the Contractor should have drilling capability to at least 300 ft. One test hole well…will be drilled between 250 – 300 ft, and a capacity test will be performed." (*Id.* at 2874) The measurement and payment provisions under paragraph 4.3.2 of the SOW provided that payment for drilling work under CLIN 0002AA would "be made at the contract unit price" ($183.00/per linear foot), and "[d]rilling will be measured for payment on the basis of the linear feet of holes actually drilled from the ground surface through overburden, and rock to depth" (*id.* at 2890).

12. It is uncontroverted that CRI submitted a proposal, dated 18 August 2010, to the government, proposing a total price of $132,366.50 for the requested well and pump installation work (gov't opp'n, Genuine Issues of Material Fact (GIMF) at 2, ¶ 1.a.ii.3). With regard to CLIN 0002AA, CRI proposed a total amount based on a quantity of 250 linear feet, at a unit price of $183 (app. mot., ex. 1; R4, tab 24 at 2897-98).

---

[3] The attached statement of work in the record is entitled, in part, as "Scope of Work" and dated 23 June 2010 (R4, tab 24 at 2874-95).

13.  By letter dated 3 September 2010, CRI notified the government that it encountered a differing site condition that impacted its earthwork activities.  CRI asserted that "[d]uring excavation…unmarked sensor wires, piping and large boulders were encountered that constitute a change in site conditions.  These conditions are not shown on the plans, neither are they reasonably verifiable threw [sic] normal methods."  (R4, tab 10 at 1)

14.  Effective 1 December 2010, the parties executed a bilateral modification[4] adding the installation of the domestic water well and pump work to the contract (R4, tab 12).  The modification added a new CLIN 1002, increasing the total contract price by $120,383, and did not extend the contract completion date (*id.* at 2310).

15.  Between May and August 2011, the parties executed bilateral modifications, Reference Nos. R00009, R00011, R00012, and R00013, adding work to the contract, increasing the total contract price, and extending the contract completion date (R4, tabs 18-21).  The Reference No. R00011 modification extended the contract completion date by 30 calendar days, from 1 June 2011 to 1 July 2011 (R4, tab 19 at 2377).  The Reference No. R00009 modification extended the extended the contract completion date by 28 calendar days, from 1 July 2011 to 29 July 2011 (R4, tab 18 at 2374-75).  The Reference No. R00012 modification extended the contract completion date by four calendar days, from 29 July 2011 to 2 August 2011 (R4, tab 20 at 2379).  The Reference No. R00013 modification stated that "[t]he contract completion date shall be extended by 60 calendar days" and "[t]his modification has a separate completion date of 3 October 2011" (R4, tab 21 at 2382).

16.  By letter dated 2 September 2011, the government communicated to CRI that it had "fixed the contract's beneficial occupancy date as August 31, 2011."  The letter also stated that CRI would be required to complete remaining open items, including final submittal of Operations & Maintenance (O&M) manuals, final "as-builts" drawing documents, and remaining modification work, before receiving final payment.  (R4, tab 22)

17.  By letter dated 19 November 2012, the government enclosed final payment to CRI and a Release of Claims for the contract (R4, tab 24 at 3196).  On or about 7 January 2013, CRI communicated its refusal to sign an unconditional release of claims and reserved its right to seek an adjustment under the contract (*id.* at 3197).

---

[4] The index of the government's Rule 4 file identifies this modification as Modification No. P00001 (R00002).  Upon our review, we note that this document does not contain this modification number, and several modifications to the contract in the Rule 4 file do not contain a modification number.  Each modification contains a "Reference No."  For the purposes of this motion and clarity, we will refer to a modification under this contract by its "Reference No."

18. On 11 April 2013, CRI submitted a Request for Equitable Adjustment (REA) seeking payment in the total sum of $364,694. The REA asserted multiple grounds for recovery due to delays and impacts on the project leading to increased costs - $128,351 for differing site conditions; $9,150 for additional drilling work arising under the Reference No. R00002 modification; $38,198 for extended field office overhead; $126,511 for unabsorbed home office overhead; a sum total of $47,484 for markups consisting of direct costs, bonding, insurance, and taxes based on a 29 October 2010 Modification Markup Meeting document; and $15,000 for consulting fees. (R4, tab 23 at 2407, 2415) With regard to differing site conditions that impacted earthwork activities, CRI alleged that it encountered large rock and boulders and unforeseen utilities that differed substantially from what was expected based on the geological information provided in the contract (*id.* at 2393). With regard to additional drilling, CRI alleged that it did not receive compensation for drilling 50 feet more in depth beyond the 250 feet on which its proposal price was based (*id.* at 2398-99, 2413). With regard to project delays, although the contract completion date was extended, CRI asserted that total delays on the project amounted to 300 days, and it was therefore entitled to compensation for 6 additional weeks of extended field office overhead for changed work and 176 days of unabsorbed home office overhead (*id.* at 2401, 2403, 2413-14). Lastly, CRI requested reimbursement for attorney and expert consulting fees incurred as part of contract administration (*id.* at 2415).

19. By letter dated 14 June 2013, the CO denied CRI's REA. The CO asserted, among other things, that the modification adding the well drilling requirements was awarded as a lump sum and not at CRI's proposed unit pricing, CRI was provided time extensions under the relevant modifications, and no work under the contract was suspended. (R4, tab 28)

20. By letter dated 15 August 2013, CRI converted its 11 April 2013 REA into a certified claim pursuant to the Contract Disputes Act, 41 U.S.C. §§ 7101-7109 (R4, tab 30).

21. On 4 June 2014, a COFD was issued denying CRI's claim, generally for the same reasons expressed in the government's denial of the REA (R4, tab 2).

22. On 2 September 2014, CRI timely appealed from the COFD to the Board. CRI filed a motion for summary judgment on entitlement on 25 June 2015. The government filed in opposition to appellant's motion and did not cross-move for summary judgment.

23. During the pendency of CRI's motion for summary judgment in this appeal, the Board was made aware of CRI's pending Chapter 7 bankruptcy proceedings at the United States Bankruptcy Court for the Western District of Washington (*see* Bd. corr. ltr. dtd. 11 August 2015 from Chapter 7 bankruptcy trustee). By letter dated 26 October 2015,

the bankruptcy trustee communicated to the Board that it intended to authorize a creditor of CRI's bankruptcy estate to continue prosecution of the appeal.

24. By letter dated 25 November 2015, bankruptcy creditor Columbia State Bank (Columbia Bank or appellant), entered its appearance in this appeal. Pursuant to an Order issued by the Bankruptcy Court, CRI's claim in the captioned appeal was assigned to Columbia Bank, and Columbia Bank was authorized to pursue the appeal on behalf of the bankruptcy estate (*see* Bd. corr., 17 December 2015 conference call memo). The appeal caption was modified accordingly to reflect the appearance of Columbia Bank as the real party in interest in the appeal.

## DECISION

It is well settled that summary judgment is appropriate only where the movant establishes that there is no genuine issue as to any material fact and that it is entitled to judgment as a matter of law. A material fact is one which may affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). We do not resolve controversies, weigh evidence, or make determinations of credibility. *Id.* at 255. All reasonable inferences are drawn in favor of the nonmovant. *Id.*

*Constructive Change - Additional Drilling Depth of Water Well*

Appellant alleges that the government directed it to perform extra work—drill an additional depth of 50 feet—although the Reference No. R00002 modification that the parties executed required a 250-foot well depth (app. mot. at 1-2).[5] The government contends that it requested a proposal from appellant for the drilling of a well depth between 250 and 300 feet, relying on language contained in paragraph 1.1 of the statement of work (SOF ¶ 11; GIMF at 1-2, ¶¶ 1.a.ii.1, 1.a.ii.2). Appellant counters that the government requested a proposal that specified the drilling depth as a unit rate for 250 linear feet (app. reply at 2).

Generally, an issue of contract interpretation is amenable to summary judgment where no ambiguity in the contract terms at issue exists requiring the weighing of extrinsic evidence. *ECCI-C Metag, JV*, ASBCA No. 59031, 15-1 BCA ¶ 36,145 at 176,419. Here we have contradictory contract provisions that create an ambiguity. On the one hand, the measurement and payment provisions of the contract provide that payment would be made on a unit price basis and measured on the basis of the linear feet actually drilled; and appellant proposed a total price of $132,366.50 based on 250 linear feet at a unit price of $183 per foot (SOF ¶¶ 11-12). On the other hand, the resulting modification added one new CLIN to the contract in a lump sum price and did not

---

[5] We note that appellant's claim demanded a sum certain of $9,150 which was denied in the COFD (SOF ¶¶ 18-19). In its complaint, appellant now revises its amount to $11,071.50, enlarging its existing claim to include a markup.

expressly incorporate appellant's proposal (SOF ¶ 14). Moreover, the language in paragraph 1.1 of the statement of work states that the government anticipated that the well would be drilled to 250 feet but also that the test hole was to be drilled between 250-300 feet (SOF ¶ 11). Because contradictory provisions exist requiring examination of extrinsic evidence to determine the parties' intentions, granting of summary judgment is not appropriate. *See AshBritt, Inc.*, ASBCA Nos. 56145, 56250, 09-2 BCA ¶ 34,300 at 169,434 ("When the meaning of a contract and the parties' intentions are both relevant and in dispute, there are mixed questions of fact and law that pose triable issues precluding summary judgment.").

### Differing Site Conditions

In its claim, appellant seeks a contract adjustment for two differing site conditions. It alleges that it encountered the presence of large rock, boulders, and organic debris underground that differed substantially from what was represented in the contract documents while performing earthwork activities on the project. Appellant also alleges that it encountered underground low voltage sensor wires and related utilities that were damaged and repaired during excavation. Appellant asserts that these differing site conditions impacted the project schedule and it incurred additional costs beyond what it reasonably expected when it submitted its bid.

FAR 52.236-2, DIFFERING SITE CONDITIONS (APR 1984), recognizes two types of differing site conditions that entitle a contractor to an equitable adjustment under the contract. Under paragraph (a)(1), a Type 1 differing site condition consists of "subsurface or latent physical conditions at the site which differ materially from those indicated" in the contract. To prevail on a Type 1 differing site condition claim, a contractor has the burden to show that:

> (1) [T]he condition indicated in the contract differs materially from those actually encountered during performance; (2) the conditions actually encountered were reasonably unforeseeable based on all information available to the contractor at the time of bidding; (3) the contractor reasonably relied upon its interpretation of the contract and contract-related documents; and (4) the contractor was damaged as a result of the material variation between expected and encountered conditions.

*Optimum Services, Inc.*, ASBCA No. 58755, 15-1 BCA ¶ 35,939 at 175,654 (citing *Stuyvesant Dredging Co. v. United States*, 834 F.2d 1576, 1581 (Fed. Cir. 1987); *Comtrol, Inc. v. United States*, 294 F.3d 1357, 1362 (Fed. Cir. 2002)). What is indicated in the contract does not need to be explicit or specific but must contain "reasonably plain or positive indications in the bid information or contract documents that such subsurface conditions would be otherwise than actually found in contract performance." *P.J. Maffei*

8

*Bldg. Wrecking Corp. v. United States*, 732 F.2d 913, 916 (Fed. Cir. 1984) (quoting *Pacific Alaska Contractors, Inc. v. United States*, 436 F.2d 461, 469 (Ct. Cl. 1971)). Under paragraph (a)(2), a Type 2 differing site condition consists of "unknown physical conditions at the site, of an unusual nature, which differ materially from those ordinarily encountered and generally recognized as inhering in work of the character provided for in the contract." To assert a Type 2 differing site condition, "the unknown physical condition must be one that could not be reasonably anticipated by the contractor from his study of the contract documents, his inspection of the site, and his general experience[,] if any, as a contractor in the area." *Randa/Madison Joint Venture III v. Dahlberg*, 239 F.3d 1264, 1276 (Fed. Cir. 2001) (quoting *Perini Corp. v. United States*, 381 F.2d 403, 410 (Ct. Cl. 1967)).

What is indicated in the contract is a matter of contract interpretation. *H.B. Mac, Inc. v. United States*, 153 F.3d 1338, 1345 (Fed. Cir. 1998). As to its first differing site condition allegation regarding the large rocks, boulders, and organic debris encountered, appellant heavily relies on a sentence in the government's response to a pre-award inquiry that states "There is no expectation to have significant over-excavation or to haul this material off" (SOF ¶ 9), and concludes that it is entitled to an equitable adjustment because significant overexcavation and "haul off" did occur. However, we do not read this sentence in isolation when interpreting the terms of a contract; instead contract interpretation involves reading the contract as a whole and giving reasonable meaning to all of its parts. *NVT Technologies, Inc. v. United States*, 370 F.3d 1153, 1159 (Fed. Cir. 2004). The preceding sentence in the government's response states that the "[s]ite consists of spoil material from original Dam construction" (SOF ¶ 9). These two sentences were in response to a question that asked whether woody debris noted in the boring log would require "haul[] off" (*id.*). Hence, significant overexcavation and "haul off" were not expected for spoil material at the site indicated in the contract's boring logs. However, the record does not show, nor can we conclude without further development of the record, whether the large rocks and organic debris appellant alleges it encountered differed from "spoil material" as indicated in the contract's boring logs, or were otherwise not reasonably anticipated, so as to support a Type 1 differing site condition. Nor does the record before us sustain the conclusion that appellant encountered conditions of an "unusual nature" so as to support a Type 2 differing site condition. Therefore, appellant is not entitled to judgment as a matter of law and summary judgment is denied.

With regard to its second differing site condition allegation regarding underground sensor wires and utilities, appellant contends that it should not be responsible for the damage and repair of these wires and utilities it encountered because it relied on a drawing which did not disclose their presence. Further, appellant alleges that the government knew the location of the previously installed wires and utilities and failed to disclose this information to appellant. (App. mot. at 5-6) The government contends that appellant failed to meet certain contract requirements in connection with locating and verifying underground utilities when performing excavation activities on the project

9

(gov't opp'n at 10). We cannot conclude, without further development of the record, what subsurface sensor wires and utilities were indicated in the drawing at issue and whether the conditions appellant alleges it encountered differed materially, whether the conditions encountered were "unusual," and whether contract requirements were met by appellant related to utility location procedures prior to performing excavation activities. There are genuine issues of material fact precluding entry of summary judgment on this differing site condition issue. To the extent that appellant seeks recovery on an alternative theory based upon the doctrine of superior knowledge, the record currently does not support such a determination.

*Delays – Field Office Overhead and Unabsorbed Home Office Overhead Costs*

In its motion, appellant alleges that the government is solely responsible for project delays including, among other things, failing to provide accurate designs, specifications, and other information necessary for contract performance, and failure to timely approve contract modifications (app. mot. at 6-7). According to appellant, these impacts entitle it to field office overhead costs under the contract and unabsorbed home office overhead costs calculated based upon the *Eichleay* formula as enumerated in *Eichleay Corp.*, ASBCA No. 5183, 60-2 BCA ¶ 2688. To prove entitlement for a compensable delay, "appellant must show that the government was responsible for specific delays; overall project completion was delayed as a result; and any government-caused delays were not concurrent with delays within appellant's control." *Versar, Inc.*, ASBCA No. 56857 *et al.*, 12-1 BCA ¶ 35,025 at 172,128. Additionally, a contractor must demonstrate that work was suspended putting it on standby to recover *Eichleay* damages. *P.J. Dick Inc. v. Principi*, 324 F.3d 1364, 1371 (Fed. Cir. 2003); *KBJ, Inc.*, ASBCA No. 58512, 16-1 BCA ¶ 36,289 at 176,983; *B.V. Construction, Inc.*, ASBCA No. 47766 *et al.*, 04-1 BCA ¶ 32,604 at 161,359.

Appellant asserts that a 13 September 2011 letter from the government establishes that the government failed to convey certain information to appellant in connection with work under the Reference No. R00013 modification, causing delays to the project schedule. According to appellant, this omission created uncertainty as it could not begin the modification work until November 2011, and actual completion of all contract work did not occur until 27 March 2012, well beyond the completion date of 3 October 2011 granted in the modification. (App. mot. at 7, 9) Appellant also asserts that demobilization of its field office was not completed until 28 November 2011 and that it continued to incur the cost of on-site management from 28 November 2011 to 27 March 2012 (app. mot. 10-11). The government argues that its letter did not acknowledge that it is the sole cause of the alleged delays and indicated that extra time was already provided in the modification to account for the omitted information (gov't opp'n at 7-8). The government contends that appellant is not entitled to field office overhead costs because appellant's quality control reports in the record only substantiate work on 19 days between 23 August 2011 and 23 March 2012 (GIMF at 8, ¶ 3.b.iv.1.a).

10

Drawing all reasonable inferences in favor of the nonmovant, here the government, we conclude that genuine issues of material fact exist both as to the cause(s) and the duration of the delay. Material facts in dispute include, but are not limited to: whether the government's actions or inaction surrounding the Reference No. R00013 modification are the sole cause for the alleged performance delays; whether the government provided appellant with defective plans and specifications that affected appellant's ability to complete performance of the modification work within schedule; and whether completion of the modification work correspondingly delayed completion of other outstanding CLINs in the contract. Moreover, the record does not contain sufficient evidence that appellant was on standby throughout the alleged delay period, a required element for recovering *Eichleay* damages. Therefore, appellant is not entitled to summary judgment.

*Consulting Fees and Miscellaneous*

The costs of professional and consultant services are generally allowable when reasonable in relation to the services rendered and not contingent upon recovery of the costs from the government. FAR 31.205-33. CRI's REA includes $15,000 in expert consulting fees (SOF ¶ 18). There is not sufficient evidence in the record of either the services performed or the payment made for these services to allow us to conclude that CRI is entitled to recover for these costs. Nor are we able to conclude that CRI is entitled to compensation for markup and bonding costs and taxes without further development of the record. Therefore, appellant is not entitled to judgment as a matter of law and summary judgment is denied.

### CONCLUSION

For the reasons stated above, CRI's motion for summary judgment is denied.

Dated: 9 June 2016

LYNDA T. O'SULLIVAN
Administrative Judge
Armed Services Board
of Contract Appeals

(Signatures continued)

11

I concur                                    I concur

_____                    _____
MARK N. STEMPLER                             RICHARD SHACKLEFORD
Administrative Judge                         Administrative Judge
Acting Chairman                              Vice Chairman
Armed Services Board                         Armed Services Board
of Contract Appeals                          of Contract Appeals


        I certify that the foregoing is a true copy of the Opinion and Decision of the
Armed Services Board of Contract Appeals in ASBCA No. 59531, Appeal of Columbia
State Bank (formerly Appeal of Castle-Rose, Inc.), rendered in conformance with the
Board's Charter.

        Dated:

                                _____
                                JEFFREY D. GARDIN
                                Recorder, Armed Services
                                Board of Contract Appeals